# CASES

## ARGUED AND DETERMINED

### IN THE

# SUPREME COURT OF ILLINOIS.

ELIPHALET W. BLATCHFORD et al.

*v.*

HENRY W. NEWBERRY et al.

*Filed at Springfield June 24, 1878---Re-filed February 2, 1880.*

1. WILLS—*survivorship---to what time to be referred.* It is a settled rule of construction, that words of survivorship occurring in a settlement (that is, a will,) should be referred to the period appointed by that settlement for the payment or distribution of the subject matter of the gift,—and in the event of such a gift, the survivors are to be ascertained in like manner by a reference to the period of payment or distribution.

2. So, where a gift to survivors is preceded by a life or other prior interest, it takes effect in favor of those who survive the period of distribution, and those only,—or, where the income of a fund is given to a tenant for life, and there is a gift over after his death to children, or a class of persons surviving, it is a gift only to those who are then surviving. "Surviving" means surviving at the time of the distribution and possession of the estate, unless a special contrary intent is found in the will.

3. SAME—*acceleration of remainders.* The doctrine of acceleration of remainders proceeds upon the supposition, that though the ulterior devise is in terms not to take effect in possession until the decease of the prior devisee, if tenant for life, or, as given by the English rule, his decease without issue if tenant in tail, yet that, in point of fact, it is to be read as a limitation of a remainder, to take effect in every event which removes the prior estate out of the way.

---

* The opinion in this case was filed originally on the 24th of June, 1878. Subsequently a rehearing was granted, and upon further consideration the opinion was re-filed February 2, 1880, as the opinion of the court.

99   11
132   299

99   11
40a 413
41a 474

99   11
149   479
152   275
44a 502

99   11
158   148

99   11
62a 282
62a 616

99   11
154   249
65a 331

99   11
72a 252

99   11
176   539

99   11
86a 572

99   11
187   c 69
187   c 71

99   11
189   3475

99   11
99a   6374

99   11
212   2 47
212   2355

4. A gift to A for life, and from and after the decease of A, to somebody else, means from and after the determination of the estate,—and whether the estate is determined by revocation, or by death, or by the incapacity of the devisee to take, or by his refusal to take, or by a forfeiture clause, or by any other circumstance, the life estate being out of the way, the remainder takes effect, having only been postponed in order that the life estate may be given to A.

5. This doctrine of acceleration, however, is not an arbitrary one, but is founded on the presumed intention of the testator, that the remainder-man should take on the failure of the previous estate, notwithstanding the prior donee may be still alive, and is applied in promotion of the presumed intention of the testator, and not in defeat of his intention. And when it is the evident intention of the testator that the remainder shall not take effect till the expiration of the life of the prior donee, the remainder will not be accelerated. And this intention of the testator, which is to be regarded in the interpretation of the will, is not the intention to be deduced from speculation upon what the testator may be supposed to have intended, but it is the intention as spoken by the words of the will.

6. SAME—*testamentary provision in lieu of dower—of its nature—and of its effect upon a clause appointing the time of final distribution.* A provision by will in lieu of dower is, in fact and in legal effect, a mere offer by the testator to purchase out the dower interest for the benefit of his estate.

7. Where there is dower estate, and a testamentary estate given for life on condition that it shall be accepted in lieu of dower, and the will expressly providing that the gift shall be void unless there be a formal relinquishment made of the dower estate within a specified time, and then the simple direction, without more, that the final distribution of the estate shall be upon the death of the wife, that event is the time for the distribution, whether the testamentary provision be accepted or not.

8. SAME—*application of these rules in the particular case.* A testator having died, leaving a widow and two unmarried daughters, it was found that by his will he devised and bequeathed to certain trustees his whole real and personal estate, after paying certain specific legacies, to be held upon the general trusts declared in the will, until its distribution by them to the persons ultimately entitled,—the will containing careful directions governing during this period, the administration of the estate and its income. The will made certain provisions for the wife of the testator, on the condition that she would consent to accept the same in lieu of her dower right and all other right in the estate. The remainder of the net income of the estate was to be divided by the trustees equally between the two daughters, for life, with benefit of survivorship between them in such income. After their lives and that of the wife, the whole of the estate was to be, by the trustees, divided equally amongst and distributed to the children of the daughters, the child

or children of either taking the whole in default of lawful issue of the other. There was then this further provision: "In case of the death of both my said daughters, without leaving lawful issue, then, immediately after the decease of my wife, if she survive my said daughters, but if not, then immediately after the decease of the last surviving one of my said daughters, my said trustees shall divide my estate into two equal shares—my said trustees being the sole judges of the equality and correctness of such division—and shall at once proceed to distribute one of such shares among the lawful surviving descendants of my own brothers and sisters, such descendants taking *per stirpes* and not *per capita*. The other share of my estate shall be applied by my said trustees as soon as the same can be consistently done, to the founding of a free public library to be located in the city of Chicago." Both of the daughters died without issue and unmarried. The widow was still living, but had renounced her rights under the will, taking her statutory share of the estate. Certain descendants of the brothers and sisters of the testator, living at the death of the last daughter, who died after the renunciation of the widow, sought a present distribution of the estate, alleging that the renunciation by the widow of the testamentary provision made for her was equivalent, so far as concerned the time of the final distribution of the estate as prescribed in the will, to her actual death. But it was held otherwise. The distribution could not take place during the lifetime of the widow, notwithstanding her renunciation.

9. The widow, by her renunciation, became "incapable of taking," but that would not in this case operate to accelerate the remainder, because the will provides that in the event of such incapacity to take, the bequest shall revert to and become a part of the estate. So, in considering this as an element entering into the construction of the will, it may be said that although the death of the two daughters and the renunciation by the widow may concur, the effect would be, not to hasten or in anywise affect the expressed time of the distribution, but simply that the bequests to the daughters and the failing bequest to the wife should revert to and become a part of the testator's estate, with the intention, presumably, that they should be and remain such, in the hands of the trustees, to be cared for and managed by them until the appointed time for the distribution should come, namely, the death of the wife.

10. Conceding the principle of the rule to be, that the remainder is accelerated whenever it is apparent that the only object of postponing the remainder-man was that the property might be enjoyed by the tenant for life,—yet here, that was not the sole purpose of the postponement, for the scheme was that the body of the estate should be held in the hands of the trustees to be managed, improved and augmented by them under the directions given by the testator, for a certain length of time, which was to be measured by the three lives of the wife and the two daughters.

11. If the time of distribution is to be considered as dependent on a life estate, it must be regarded as only contingently so on this particular testamentary substitute—in case of its acceptance by the widow—and that if not accepted, it was dependent on the dower estate. That it is to be viewed as fixed with reference to whichever should ultimately be and remain the estate of the widow, according as she should accept or renounce the provision under the will. Though the widow has renounced, still a life interest—the dower estate—yet remains in her. There is, too, the trust estate. So the intermediate estate is not gone and out of the way—there was no failure of the precedent estate upon which the ultimate remainder was limited.

12. The time for distribution of this estate, then, being at the death of the widow of the testator, and not before, and the survivorship of the ultimate donees—the "lawful surviving descendants" of the brothers and sisters of the testator—being referred to such period of distribution, only those of the class of "surviving descendants" who may be living and capable of taking at the time of the death of the widow are entitled to the benefit of the bequest. Surviving at the time of distribution is a part of the description given by the will, of the donees, and there is no gift to any one who does not answer the description of this element of time. So, although those seeking a present distribution, before the death of the widow, are the "lawful descendants" of the brothers and sisters of the testator, they are not the "lawful *surviving* descendants," within the meaning of the will, and until the time of distribution it can not be known who of them will be alive to take then,—until that time arrives it can not be ascertained and made certain who the donees are.

APPEAL from the Circuit Court of Cook county; the Hon. E. S. WILLIAMS, Judge, presiding.

This was a suit in chancery, instituted in the court below by Henry W. Newberry, Louisa Cook Candee, Fanny L. Edgerton, Oliver N. Edgerton, Walter A. Newberry, Edward H. Newberry, William E. Newberry, Charles P. Newberry, Mary A. Ladue, George P. Newberry, Mary A. Starkweather, John S. Newberry, and Walter Cass Newberry for himself, and also as next friend of the minors, Walter F. Newberry, Ella P. Newberry, Amasa S. Newberry, Frederick M. Newberry, and John P. Newberry, against Eliphalet W. Blatchford and William H. Bradley, trustees under the last will and testament of Walter L. Newberry, deceased, and Julia Butler Newberry, the widow of the testator. The complain-

ants are the nephews and nieces and grand nephews and nieces of the testator, who are seeking a present distribution of the estate, claiming to be the ultimate donees under the will.

Such portions of the will of Walter L. Newberry as are essential to an understanding of the questions presented are as follows:

" I, Walter L. Newberry, of the city of Chicago, in the county of Cook, and State of Illinois, do by these presents make and publish this my last will and testament:

"And, for the purpose of carrying the same into effect, I hereby nominate and appoint Mark Skinner and Eliphalet W. Blatchford, both of the city of Chicago, aforesaid, and the survivor of them, my executors and executor of this my last will and testament, and do hereby give to and invest them, and the survivor of them, with such authority and powers in and over the property hereby bequeathed and disposed of, as are necessary to carry into effect my intentions and design in the execution of this my will, and in the several donations and legacies herein specified and made. And I do hereby devise and bequeath unto the said Mark Skinner and Eliphalet W. Blatchford, and the survivor of them, the residue and remainder of all my estate, real and personal, of which I shall die seized and possessed, or to which I may have any claim or right remaining after the specific donations hereinafter mentioned and contained, or as I shall hereafter make by any will or codicil remaining unrevoked at the time of my decease, in trust, for the purposes hereinafter fully set forth.

"It is my will, and I hereby direct, that my said executors, above mentioned, be not required, either jointly or severally, to give or furnish bonds, with or without security, for the performance of their duties as such executors, or as trustees, or otherwise, and that neither the said Mark Skinner nor the said Eliphalet W. Blatchford shall be answerable for any part of my estate which may be received by the other, nor

shall either be held in anywise answerable for the debt, default, or miscarriage of the other in any matter connected with my estate. And it is my will that my estate be charged with the payment of such reasonable compensation to the said Mark Skinner and Eliphalet W. Blatchford as they may deem just and proper, according to the time and attention they may severally devote to the affairs of my estate; and for the purpose of conducting the business of my said estate, my said executors and trustees are authorized, at the cost and charge of my estate, to keep an office and employ such clerks and agents as they may deem necessary for the proper transaction of the business of the estate.

(Then follow directions in regard to his funeral expenses and the payment of debts.)

"It is my will, and I hereby direct, that my said trustees, and the survivor of them, shall have the power, and shall exercise full control at all times in the appointment of their successors, both as trustees as hereby constituted, and as executors of this my will, and that they, the said Mark Skinner and Eliphalet W. Blatchford, and the survivor of them, shall decide whether the persons so to be appointed and designated by them to succeed them as my trustees and executors, shall or shall not give security for the faithful performance of their duties.

(Several bequests to persons other than members of his immediate family.)

"It is my will and desire to make provision for my beloved wife, Julia Butler Newberry, provided she consents to accept of the same in lieu of and instead of her dower right, and all other right, claim and demand to my estate, or any part thereof, in the following manner: I give and bequeath to her all the household furniture, books, paintings and works of art, (except such as I may hereinafter specially bequeath to others,) carriages, horses and harness that may belong to me at the time of my decease, to be hers absolutely. I also give and bequeath to her a life estate in the south-west quarter of

block thirty-four (34) in Kinzie's addition to Chicago, in the city of Chicago aforesaid, with the dwelling-house, etc., situated thereon, being occupied by me at present as my homestead, to be held, used and occupied by her during her life as she may see fit. And I do hereby direct that my said trustees pay to her, for her support during her natural life, the sum of eight thousand dollars ($8,000) annually, to be paid to her in quarter-yearly payments of two thousand dollars ($2,000), upon her sole and separate receipt, acquittance or order. In case my said wife should prefer to reside elsewhere than in the city of Chicago, she shall have the right at any time, upon first notifying my said trustees in writing of her desire, to change her residence, and upon relinquishing and conveying to them and putting them in unincumbered and disembarrassed possession of said south-west quarter of block thirty-four (34) in Kinzie's addition to Chicago, to become from thenceforward a part of the mass of my estate in the hands of my said trustees, to request my said trustees to purchase for her use and occupancy during her life another house and lot wheresoever in the United States of America she may prefer to reside, and thereupon my said trustees shall purchase at such point or place in the United States of America as my said wife shall indicate in writing, a house and lot of a value not to exceed the sum of thirty thousand dollars ($30,000), and shall furnish the same in due and proper manner, at a cost not to exceed five thousand dollars ($5000), which said house and lot shall belong to and be a part of my estate, subject to be used and occupied by my said wife during her natural life, but the furniture to be absolutely hers. None of the foregoing provisions for the benefit of my wife shall be operative or have any effect, but the same shall all and singular be inoperative and void, unless she shall within twelve months after my decease relinquish in due form of law, all right, title, claim and demand which she may have or be entitled to by law, by way of dower or otherwise, to my estate or any part or portion thereof, it being my inten-

tion that the foregoing provision for my said wife shall, if taken and accepted by her, be wholly in lieu of and instead of her dower, and any and all other claims, demands and right which she has or may have by law or in anywise to 'my estate, or any part or portion thereof.

" I give and bequeath, and hereby direct, my said trustees to pay to my daughter Mary Louisa Newberry, the sum of twenty-five thousand dollars ($25,000) on her arriving at the age of twenty-five (25) years, but if she should marry before arriving at that age, then the said sum of twenty-five thousand dollars ($25,000) shall be paid to her upon the consummation of her marriage, upon her sole and separate receipt or order in writing.

" In like manner I give and bequeath, and direct my said trustees to pay to my daugher Julia Rosa Newberry, the sum of twenty-five thousand dollars ($25,000) on her arriving at the age of twenty-five (25) years, but if she should marry before arriving at that age, then the said sum of twenty-five thousand dollars ($25,000) shall be paid to her upon the consummation of her marriage, upon her sole and separate receipt or order in writing.

" It is my will, and I hereby direct, that after the payment of the gifts, devises and bequests, in this my will specially set forth, my said trustees shall divide the net income annually arising from the residue and remainder of my estate remaining in their hands, and subject to their control, equally between my said daughters; Mary L. Newberry and Julia R. Newberry, to be theirs absolutely. Such division and apportionment shall be made yearly, and as soon after the first day of January, in each and every year, as the same can conveniently be done by my said trustees, and payment thereof shall be made to my said daughters, respectively, upon their sole and separate receipt, or order in writing. In case, however, that my said daughter Julia shall not, at the time my said trustees enter upon the discharge of their duties as such trustees, have arrived at the age of twenty-one years, and

remain unmarried, then my said trustees shall appropriate from her share of such annual net income, from time to time, so much thereof as shall be necessary for her support, clothing, education, traveling expenses, etc., and shall invest the remainder for her benefit. Whenever and as soon as my said daughter Julia shall become married, if she marry before arriving at the age of twenty-one years, and in any event when she shall arrive at the age of twenty-one years, my said trustees shall assign over and deliver to her all the securities in which any accumulation of her moiety from such net income may have been invested, and shall pay to her the portion of such accumulation, if any, remaining uninvested in their hands, and thereafter shall regularly pay over to her, on her sole and separate receipt, or order in writing, as above provided, year by year, her portion of such annual net income. And it is my will that my said daughters shall always have the absolute control and enjoyment of whatsoever they may receive in anywise from my estate, as provided in this my will, without any interference on the part of their husbands, in case they, or either of them, should marry, and without such share or portion being in anywise liable for the debts of such husbands, or be in anywise subject to the control, order or disposition of any such husband or husbands.

"If, from any cause, the net income of my estate shall at any time be inadequate to the support of my said daughters, and there shall not be in the hands of my trustees, from such net income, sufficient to enable them to pay over yearly, and every year, to each of my said daughters, at least the sum of twenty-five hundred dollars ($2500), then, and in such case, I direct that my said trustees take from the principal of my estate so much as will make up, with the net income, a sum sufficient to enable them to apportion to each of my said daughters twenty-five hundred dollars ($2500), and to pay the same to them, respectively, in manner and form as hereinbefore provided.

" I hereby give and bequeath to my said daughter Mary, the portrait of myself, painted by Healy; and to my said daughter Julia, I give and bequeath my gold watch that I have worn for many years, and I give her, with the watch, the key and other attachments.

" In case of the death of either of my said daughters, leaving no lawful issue living, I will and direct that the part and portion of the net income which would have belonged to such daughter, as hereinbefore provided, had she survived, shall, from and after her decease, belong to and be paid over by my said trustees to my other daughter, if she survive; but if she, too, has then deceased, leaving lawful issue, then such part and portion shall belong to and be paid over to such lawful issue, until the final distribution of my estate, as hereinafter provided.

" In case of the death of both of my said daughters without lawful issue, it is my will that thereafter the portion of my estate, both principal and interest, which would have belonged to them, respectively, in case they or either of them had survived, shall revert to and become a part of my estate. And it is my will, and I direct, that in the case of each and every bequest, and of every instance in which I have directed my trustees to pay over money to any person or persons whomsoever, if the person or persons to whom or for whose benefit I have made such bequests, or directed money to be paid as aforesaid, shall have deceased, or from any cause be incapable of taking, then the amount so bequeathed, or so directed to be paid over, shall revert to and become a part of my estate, unless I have otherwise specifically directed.

" In case of the death of both or either of my daughters, during the lifetime of my wife, leaving lawful issue living, it is my will, and I direct, that such lawful issue shall have and receive from my said trustees the portion of the net income from my estate which would have belonged to that one of my daughters from whom they are descended, had she survived, such lawful issue taking in these cases, and also in

all cases arising under this my will, *per stirpes,* and not *per capita.*

"It is my will, and I direct, that neither of my said daughters, or their issue, shall have the power or right to expend in advance, or anticipate, mortgage or encumber in anywise, the yearly income from my estate, so to be paid year by year to them, respectively, as hereinbefore provided; nor shall they have the right to give orders in advance for the same on my said trustees.

(Giving specific directions for distribution among his grand children in case of the death of one or both of his daughters leaving lawful issue.)

"In case of the death of both of my said daughters, without leaving lawful issue, then immediately after the decease of my wife, if she survive my said daughters, but if not, then immediately after the decease of the last surviving one of my said daughters, my said trustees shall divide my estate into two equal shares, my said trustees being the sole judges of the equality and correctness of such division, and shall at once proceed to distribute one of such shares among the lawful surviving descendants of my own brothers and sisters, such descendants taking *per stirpes,* and not *per capita.*

"The other share of my estate shall be applied by my said trustees, as soon as the same can consistently be done, to the founding of a free public library, to be located in that portion of the city of Chicago now known as 'The North Division.' And I do hereby authorize and empower my said trustees to establish such library on such foundation, under such rules and regulations for the government thereof, appropriate such portion of the property set apart for such library, to the erection of proper buildings, and furnishing the same, and such portion to the purchase and procurement of books, maps, charts, and all such other articles and things as they may deem proper and appropriate for a library, and such other portion to constitute a permanent

fund, the income of which shall be applicable to the purpose of extending and increasing such library,—hereby fully empowering my said trustees to take such action in regard to such library as they may judge fit and best, having in view the growth, preservation, permanence and general usefulness of such library.

"In the management and conduct of my estate by my said trustees, it is my will, and I direct, that the following described premises and property, situate, lying and being in the city of Chicago, aforesaid, to-wit: (describing the property), shall not be sold or mortgaged by my said trustees during the lifetime of my wife and daughters, or either of them, nor until it shall become necessary for my said trustees to divide and make final division and distribution of my estate as hereinbefore in this my will provided; but my said trustees shall have the right and power at all times to demise, lease, and to farm let all and singular the above described property and premises, to such persons, in such tracts and parcels, at such rent, upon such terms, and for such length of time, as they may judge best,—no lease, however, to be made for a longer term than five years, in order that my said trustees may as often as once in five years, at the furthest, have the control of said premises, in order that they may again lease the same, or make such other disposition of the same as circumstances may require.

"It is my will, and I direct, that all my estate, real and personal, shall at all times be subject to the absolute control and management of my said trustees, to be sold, conveyed, leased, or otherwise disposed of by them, precisely in the same manner as I myself have the right to do now in my lifetime, at the time of making this my will, it being my intention that there shall be no limitation or restriction to their power or control over all and singular my estate, and every part and portion thereof, excepting as is reserved in the provision of my will immediately preceding this, to the end that they may apply all my said estate, and the incre-

ment and income thereto and thereof, to the uses and purposes, and in manner and form as in this my will directed. It is my will, and I direct, that my said trustees shall have the right, if they judge best, to sell and dispose of each, any, and every portion of my real estate, either for cash or upon credit, to such persons and upon such terms as they may judge best, except as hereinbefore reserved and limited, and to apply the proceeds arising from such sale and disposition of my real estate, and also such portions of my personal property as they shall judge best, in improving any portion of my real estate by erecting stores, dwellings, hotels, offices of all kinds, with all proper out-buildings, and to make all necessary minor improvements thereon, for such uses and purposes as they shall judge best for the interest of my estate; but it is my wish and desire that permanent, substantial improvements shall first and chiefly be made by my said trustees upon the property and premises reserved in the foregoing provision of this my will from being sold by my said trustees, until it may become necessary to sell the same in order to make a final division and distribution of my estate, as hereinbefore in this my will provided.

"In making investment of money that may from time to time come into the hands of my trustees, and not be used by them in the fulfillment of the trusts in this my will provided, nor in making improvements as mentioned in the foregoing provision of this my will, it is my wish, and I direct, that my said trustees invest the same either in the securities of the United States of America, or of the State of Illinois, or of the county of Cook, or of the city of Chicago, or in loans secured by bond and mortgage on good, improved, unincumbered real estate in the city of Chicago, worth, in their judgment, at least twice the amount of the money loaned and secured thereon,—the land to be worth, without improvement, at least as much as the amount loaned upon such improved property; it being my intention that my said trustee may invest in any or all of said securities as they may see fit,

but in none other; and in purchasing bonds of the United States, State of Illinois, county of Cook, or city of Chicago, to pay therefor the market price at the time and times of making such purchase.

" It is my will, that if my said trustees, or any of them, or any trustees or trustee to be appointed under this clause, shall, after my death, die, or be unwilling, or incompetent, or unfit to accept or execute the trusts of my will, or shall desire to retire from the office, it shall be lawful for the competent accepting trustees or trustee, for the time being, if any, whether retiring from the office of trustee or not, to substitute by any writing, under their or his hands or hand, any persons or person, in whom alone, or (as the case may be) jointly with any surviving or continuing trustees or trustee, my trust estate shall vest, or by proper assurances be vested. And I exempt every trustee of my will from liability for losses occurring without his own willful default, and authorize him to retain and allow to his co-trustees or co-trustee all costs, charges and expenses incidental to the trusteeship. And I declare that the powers and discretions hereinbefore vested in my trustees hereinbefore named, shall be exercisable by the trustees or trustee, for the time being, of my will.

" It is my will, and I direct, that all taxes and assessments of every kind and character, as well income tax as all other, and all charges and expenses whatsoever incurred in the management of my estate, be first paid out of the income of my estate, if possible, and the surplus income, if any remaining in the hands of my trustees, shall be the net income of my estate.

" In consequence of an acquaintance and friendship now subsisting for thirty years between myself and my said trustee Mark Skinner, I have such confidence in his judgment, that, whilst I do not anticipate that any conflict of opinion will arise in regard to the management of my estate, it is my wish that so long as he remains trustee of my estate, his opinion

in regard to the conduct and management of the same may prevail in cases where difference of judgment may occur."

The will was executed on the 30th day of October, 1866.

Subsequently, on the 22d of July, 1868, the testator added the following codicil:

" Whereas, it will appear, by reference to that clause of my said will wherein I have made provision for my beloved wife, that I directed my trustees to pay to her during her natural life, for her support, the sum of eight thousand dollars annually, in quarter-yearly payments:

" I now declare that it is my will that said amount be increased to the sum of ten thousand dollars, and I hereby direct that instead of said sum of eight thousand dollars annually, my said trustees pay to my said wife, Julia Butler Newberry, the sum of ten thousand dollars annually during her natural life, in the same manner and for the same purpose, and upon the like terms, conditions and limitations, as set forth and expressed in said clause of my said will.

"And in the event that my said wife shall elect to accept the provision made in said will in lieu of dower, and to retain and use and occupy for her residence my present homestead, situate upon the south-west quarter of block 34, in Kinzie's addition to Chicago, then it is my will, and I hereby direct, that my said trustees, at the request of my said wife, and in their own discretion, expend from time to time, from the capital of my estate, a sum not exceeding fifteen thousand dollars in the making of repairs and additions to said premises, and in the erection of out-buildings upon said premises.

" If, in the opinion of my said trustees, it would be for the best interest of my estate, in order to secure valuable improvements to be made upon any unimproved lot or lands belonging to my estate, to lease said lot or lands for a longer period than five years, then my will is, and I hereby direct, that my said trustees lease and demise the same for any period longer than five years, but not exceeding the period of twenty years, as they may see fit.

"It is also my will, and I hereby direct, that the issue of my children shall take, under my said will, in all cases, by way of representation, and not according to their number, anything in said will contained, expressed or implied, to the contrary notwithstanding.

"It is my will, and I hereby direct, that the amount which in any one year may be charged to the income of my estate for special assessments for opening or improving streets and alleys, shall not exceed the sum of ten thousand dollars, and that any excess over and above said sum paid by my trustees in any one year, for such purpose, 'shall be taken from the capital of my estate."

At the date of the filing of the bill the two daughters of the testator had died without issue, and unmarried. The widow, however, was still living, but had previously renounced the provision made for her by the will, taking her share of the estate given by the statute.

The question presented for determination is, whether, under a proper construction of the will, there can be now, during the lifetime of the widow of the testator, a legal division of the estate by the trustees, one-half to the descendants of the testator's brothers and sister, and the other half to the public library. The circuit court decreed that the division should be now made. The defendants appealed.

Messrs. ISHAM & LINCOLN, for the appellants:

It is the settled doctrine of the courts of England, and of this country, generally, that where, by will, there is a gift to survivors, and a period can be found in the will for the payment, transfer or distribution of the subject matter of the gift, the survivorship is to be referred to the period of payment or distribution, unless there are clear words in the will compelling its reference to some other period, and the survivors intended are those surviving at that period. *Hawes* v. *Hawes*, 1 Ves. Sr. 12; *Edwards* v. *Edwards*, 15 B. 57; *Knight* v. *Poole*, 32 id. 548; *Stevenson* v. *Gullan*, 18 id. 590;

*Carver* v. *Burgess,* id. 541; *Hearn* v. *Baker,* 2 K. & J. 386; *Keathway* v. *Reed,* 3 DeG. M. & G. 22; *Cripps* v. *Walcott,* 4 Madd. 11; *Spurrell* v. *Spurrell,* 11 Hare, 54; *Wordworth* v. *Wood,* 1 H. L. 129; *Young* v. *Robertson,* 8 Jur. N. S. 825; *Greyson's Estate,* 2 DeG. T. & G. 428; *Marriott* v. *Abell,* 7 L. R. Eq. 482; Theob. on Const. of Wills, 358; *Ridgeway* v. *Underwood,* 67 Ill. 419; *Sinton* v. *Boyd,* 19 Ohio St. 30; *Cambridge* v. *Rous,* 25 B. 415; *Brograve* v. *Winder,* 2 Ves. Jr. 634; *Houghton* v. *Whitgrave,* J. & W. 146; *Newton* v. *Ayscough,* 19 Ves. 536; *Jennings* v. *Jennings,* 44 Ill. 491; *Verley* v. *Richardson,* 8 DeG. M. & G. 126; *Handberry* v. *Doolittle,* 38 Ill. 206; *Wren* v. *Hynes,* 2 Metc. (Ky.) 131; *Holcomb* v. *Lake,* 4 Zabr. 686; *Robertson* v. *Wilson,* 38 N. H. 48; *Haskins* v. *Tate,* 25 Pa. St. 251; *Lessee of Westbrooke* v. *Romeyn,* 1 Bald. 202; 2 Williams on Exrs. 1576 (n) Y.; *Stephens* v. *Evans,* 30 Ind. 47; *Olney* v. *Hull,* 21 Pick. 315; *Hurlbut* v. *Emerson et al.* 16 Mass. 240; *Thompson* v. *Luddington,* 104 id. 193; *Tier* v. *Pennell,* 1 Edw. Ch. 358; *Teed* v. *Morton,* 60 N. Y. 506.

In the present will, instead of words compelling a different reference, this reference is confirmed by the form of the gift, and by the fact that the same result would follow even if there were no words of survivorship at all, from the fact there is no gift at all, except in the direction to distribute. Nothing is given to any one except such as may be in being, capable of taking, at the time of distribution. Until the time of distribution it can not, therefore, be ascertained to whom any gift is made. *Leake* v. *Robinson,* 3 Mer. 363; *Vawdry* v. *Geddes,* 1 Russ. & My. 203; *Drake* v. *Pell,* 3 Edw. Ch. * 267; *Lock* v. *Lamb,* 4 L. R. Eq. 372; *Shum* v. *Hobbs,* 3 Dr. 98.

In this case the testator has not named his donees, but has described them. No one can claim under such a gift unless he can predicate of himself the whole of the testator's description; and when the element of time enters into the description, no one can claim to be a donee who does not answer the

description in this element of time. *Merry* v. *Hill*, 8 L. R. Eq. 619; *Festing* v. *Allen*, 12 M. & W. 279; *Holmes* v. *Prescott*, 10 Jur. N. S. 507; *Rhodes* v. *Whitehead*, 2 Dr. & Sm. 532; *Botsford* v. *Kibbell*, 3 Ves. Jr. 363; *Litchworth's Appeal*, 30 Pa. St. 175; *Newman* v. *Newman*, 10 Sim. 51; *Duffield* v. *Duffield*, 3 Bligh N. R. 260; Smith on Exec. Interests, (supplement to Fearne,) sec. 281.

But it may be urged that the doctrine of acceleration of remainders makes the extinction of the life estate, or estates after which a remainder is limited, equivalent to the death of the life tenant or tenants; that by the death of the daughters the widow became the only remaining person to whom a life interest was bequeathed, and that in the exercise of her statutory right of election she had rejected the testamentary offer in lieu of dower, and thus had already extinguished the only life estate which, by the will, was precedent to the distribution.

If, for the sake of the argument, we assume that the time of distribution is appointed with reference to the termination of the precedent life estate, it still remains true that the precedent estate is not removed.

1. The life tenant who has survived the others and is the last of the three, had her choice between two distinct interests. One was given by the law,—her dower. The other arose from the testator's desire to purchase this dower interest, and thus bring the whole estate under one management until its final disposition. Her refusal to give up her dower and take a testamentary bequest did not extinguish her relation to the estate as one of the three persons whose life interests preceded the distribution. Her refusal left her original life estate unremoved and unimpaired. Nothing in the will indicates that the statutory was any less than the testamentary one intended to precede the distribution. Neither one is a gift by the will more than the other. One is an estate for life, created by statute; the other is offered by the will, but only on condition that the first is given up in exchange. In

such case the substitute would be purchased, and not given, and would take the place of the interest for which it was substituted. *Isenhart* v. *Brown*, 1 Edw. Ch. 413; 2 Scrib. on Dower, 496; 1 Roper on Leg. 297; 2 Williams on Exrs. (ed.1877) 1364. Therefore, no end has yet been reached of the life estates preceding the period of distribution.

2. The remainders limited to a class of persons, to be ascertained by the death of a person now living, are contingent. Until that event occurs it can not be told who will be entitled to receive the estate, nor, in fact, whether any one will then be *in esse* answering the description of the donees. The estate is given to trustees to avoid intestacy, and hold it together for accumulation till that event occurs; and nothing but the occurrence of that event, upon which the remainders must rest or fail altogether, can defeat this trust estate. This estate, held for the contingent remainder-men, is precedent to the distribution, and is not removed. The question supposed, therefore, does not arise in this case. It is impossible that any act of the widow can defeat and change the trust for their unascertained remainder-men. *Roe's Exrs.* v. *Roe et al.* 21 N. J. Eq. 253; *Estate of Delaney*, 49 Cal. 76; *Plympton* v. *Plympton*, 6 Allen, 178; *Firth* v. *Denny*, 2 id. 468.

In the will there is nothing to indicate that the time of distribution was appointed on account or with reference to any preceding estates at all. The testator had the right, arbitrarily, to appoint the time of distribution at his widow's death, without reference to any precedent estates. In this case he appointed it at the death of his widow.

The testator's intention, to which the rule of acceleration is subordinate, is plainly shown,—that the estate should be held together through the lifetime of his family. The final disposition is a complete one of his entire estate. He does not attempt to make such a disposition until a time when the whole estate will be subject to such a disposition by him, and when all the interest of his widow therein will have been eliminated by her decease.

But the end of a life estate under this will is not the legal equivalent of the death of the life tenant. If all the interest of the daughters and of the widow in the testator's estate were, in fact, extinguished now, the principle of acceleration could have no application here.

In all the cases in which the principle of acceleration has ever been allowed to operate, the remainders accelerated were vested. There can be no acceleration of a contingent remainder. Theobold's Const. of Wills, 450; *Wade Gerry* v. *Handley*, 1 Ch. D. 653; *Carrick* v. *Errington*, 2 P. Wms. 361; *Augustus* v. *Seabolt*, 3 Metc. (Ky.) 156.

The principle of acceleration relates to enjoyment of an estate,—not to the title to it. It is possession that is accelerated,—not ownership. To transfer an estate from one class of persons described as donees, to another class not so described, is not acceleration of a remainder to its owners, but shifting the ownership to persons to whom it does not belong.

In all cases in which the principle of acceleration has operated, the court has had to deal with the word "death," when used as a limitation or boundary to define the end of the estate of the first taker, the life tenant. Such is always the case where there is a gift to A for life, and after his death to B,—the words "for life and after his death" represent a mere limitation or boundary of the estate of A, the first taker. In that case, B is a person definitely and unequivocally designated as the second taker. In such case the canon of definition in question, if for any reason A can not or will not take the estate, makes the word "death" the equivalent of "end of the life estate." In such case the second taker is definitely pointed out, and has an estate vested by the terms of the will itself, without any preliminary aid of the canon of definition, which is a part of the rule of acceleration. In this case the second estate is not given to definite persons by name. It is given to persons described as surviving at the death of Mrs. Newberry, so that the word

" death" points to the time which enters into the description of the donees.   The enjoyment of an estate can not be accelerated until the person is first ascertained to whom it is given.

We contend that the conditions of the rule of acceleration must precede the application of the rule, and must be created *aliunde,* and without the aid of the rule,—that the canon of definition, which is a part of the rule, can not first be applied to the description of the persons who are to take the next estate, so as to change them from one class to another, and then be applied a second time for the purpose of acceleration.   We say there can be no acceleration of a contingent estate to an uncertain and contingent person, and that the canon of definition can not be once applied to eliminate the contingency from the description of the second taker, so as to vest a contingent interest, and then applied again and a second time for the purpose of acceleration, as if this interest had been vested originally.   It can not be used, and never was used, to create the condition which, in the nature of things, must precede the operation of the rule of acceleration.

Messrs. BOUTELL & WATERMAN, also for the appellants:

If the will contained no reference to the widow's renunciation of the provision made for her, so that it might be claimed that if the testator had contemplated such a state of fact he would have provided for it, this could not avail the appellees, for the rights of parties depend on what the testator has done—not on what he might have done.   Courts interpret but do not make wills.   *Illinois Land and Loan Co.* v. *Bonner,* 75 Ill. 315.

The doctrine of the acceleration of remainders relied on, is this:   Where, in a series of consecutive limitations, a particular estate from any cause fails, the remainder immediately expectant thereon at once takes effect in possession, if there is no intention manifested to the contrary.   1 Jarman on Wills, (3d ed.) 538.

To make this doctrine applicable, several things are requisite:

1. The remainder to be accelerated must be immediately expectant on the particular life estate which fails. 1 Jarman on Wills, (3d ed.) 538; *Yeaton* v. *Roberts*, 8 Fost. 459.

2. The remainder must be a vested, and not a contingent one. Theobold on Const. of Wills, 450; *Wade Gerry* v. *Handley*, 1 L. R. Ch. Div. 650; *Carrick* v. *Errington*, 1 P. Wms. 361; *Augustus* v. *Seabolt*, 3 Metc. (Ky.) 155.

3. The remainder must be a remainder in the same property to which the particular estate relates. This follows *ex vi termini.*

4. The intention of the testator controls, and the remainder is never accelerated in opposition to that intention. *Augustus* v. *Seabolt*, 3 Metc. (Ky.) 155; *Crozier* v. *Crozier,* (cited by Lord ROMILLY in *Craven* v. *Brady,*) 4 Eq. L. R. 209; *Lainson* v. *Lainson*, 18 Beav. 1; S. C. 5 DeG. M. & G. 574; *Jull* v. *Jacobs*, 3 Law Rep. Ch. Div. 703.

The argument from inconvenience is of no avail here. It was competent for the testator to fix the period of distribution upon the termination of three lives, and with its wisdom the court has nothing to do. *Rhoades* v. *Rhoades*, 43 Ill. 239.

As to when a remainder will be accelerated, see *Eavestaff* v. *Austin*, 19 Beav. 591; *Fuller* v. *Fuller,* Croke's Eliz. 425; *Hutton* v. *Simpson*, 2 Vern. 722.

Where an intention is manifested that the remainder shall not be accelerated, it will not take place. This intent may be manifested by the devise of a contingent remainder upon an uncertain event, as in *Carrick* v. *Errington*, 2 P. Wms. 361, and *Wade Gerry* v. *Handley*, 1 L. R. Ch. Div. 650, or by a devise to contingent class, as in *Augustus* v. *Seabolt*, 3 Metc. (Ky.) 155, or by other provisions in the will inconsistent with the intent to accelerate, as in *Crozier* v. *Crozier*, 3 Drury & War. 353; *Hinkley* v. *House of Refuge*, 40 Md. 461; *Estate of Delaney*, 49 Cal. 76; *Firth* v. *Denny*, 2 Allen, 468;

*Plympton* v. *Plympton,* 6 id. 178. See, also, *Reading* v. *Black-well,* Baldwin, C. C. R. 166; *Richy* v. *Johnson,* 30 Ohio St. 288; 1 Lead. Cases in Eq. 1157–61.

Mr. WIRT DEXTER, for the appellees:

The estate vested in the appellees upon the death of the last daughter without issue. This will appear from the accepted definition of a vested remainder. See 1 Fearne on Rem. 216; 4 Kent's Com. 236; *Blanchard* v. *Blanchard,* 1 Allen, 227; *Doe, Lessee of the Poor* v. *Considine,* 6 Wall. 476.

The remainder devised to appellees having become fixed by the death of the testator's daughters without issue, and dependent alone on the termination of the life estate devised to the widow, was accelerated by the renunciation of the widow of the provision made for her. See 1 Jarman on Wills, (3d Eng. ed.) 539; *Waddle* v. *Terry,* 4 Cold. 51; *Yeaton* v. *Roberts,* 8 Foster, 459; *Finley* v. *Kings' Lessee,* 3 Pet. 346; *Piercy* v. *Piercy,* 19 Ind. 467; *Armstrong* v. *Parks' Devisees,* 9 Humph. 195; *Macknet's Executors* v. *Macknet,* 24 N. J. Eq. 277; *Adams* v. *Gillespie,* 2 Jones' Eq. 244; *Holderby* v. *Walker,* 3 id. 46; *Fuller* v. *Fuller,* vol 1, part 1, Croke's Eliz. 422; *Avelyn* v. *Ward.* 1 Ves. Sr. 420; *Hutton* v. *Simpson,* 2 Vern. part 2, 722; *Lainson* v. *Lainson,* 18 Beav. 1; S. C. 5 DeG. M. & G. 754; *Eavestaff* v. *Austin,* 19 Beav. 591; *Jull* v. *Jacobs,* 3 L. R. Div. 703.

Not one of the cases cited by appellants' counsel touches the main ground upon which the appellees proceed,—the termination of the intermediate estate and acceleration,—but they will be found, upon examination, to fall within one of three classes:

1. Where the estate was limited to a particular age or marriage.

2. Where those who were to take were described by absolute words.

3. Where the estate was limited in default of issue.

Messrs. McCAGG, CULVER & BUTLER, also for the appellees:

By the renunciation of the widow and refusal to take under the will, and the death of the daughters without issue, all the contingencies have happened upon which the estate was to pass. It can not be presumed the testator intended his estate to lie idle, and all aid to the persons of his blood be deferred, and the execution of a great charity delayed, till some fixed and unimportant event should arrive, independent of all other considerations.

The intention of the will is to be gathered by applying to it certain well known rules of construction and certain presumptions, and not solely by the idea which the court may gain from reading it, without reference to such rules,—not by looking only at the words of the will, but by construing it upon settled legal principles. Among these, no one is more sharply defined than that in favor of the earliest possible vesting of estates,—not a vesting when no other intention can be found in the will, but a vesting as soon as it is possible so to construe the will. Theobold on Construction of Wills, 264; *Walker* v. *Russell*, 10 Rich. (S. C.) 82; *Evans* v. *Godbold*, 6 Rich. Eq. 26; *Duffield* v. *Duffield*, 3 Bligh, (N. R.) 331.

The words "after" and "upon the death of my wife," and like words, do not make a contingency, but merely indicate when the remainder shall take effect in possession. *Vanderheyden* v. *Crandall*, 2 Denio, 19; *Meyer* v. *Eisler*, 29 Md. 31; *Driver* v. *Frank*, 3 M. & S. 32.

Counsel for the appellants seem to labor under an impression that a direction to pay and transfer at a certain and defined time may not be construed to import a present gift; but none of the cases cited by them so hold, and the rule of law is quite the contrary. *Chaffers* v. *Abell*, 3 Jur. 577; *Chaffers & Abell* v. *Abell*, id. 578; *Leeming* v. *Sheratt*, 2 Hare, 14; *Packham* v. *Gregory*, 4 id. 395; *Darling* v. *Blanchard et al.* 109 Mass. 176.

The words "at or after the decease of a person," do not generally denote a condition that the legatee shall survive such person, but merely the time at which such legacy shall take effect in possession. *Blamire* v. *Geldart,* 16 Ves. Jr. 314; *Medlicot* v. *Bowes,* 1 Ves. Sr. 207; *Childs et al.* v. *Russell et al.* 11 Metc. 16; *Forsythe* v. *Rathbone,* 34 Barb. 389; *Vanderheyden* v. *Crandall,* 2 Denio, 9; *Hocker et al.* v. *Gentry et al.* 3 Metc. (Ky.) 465; *Pike* v. *Stephenson,* 99 Mass. 188; *Wright* v. *Shaw,* 5 Cush. 56; *White* v. *Curtis,* 12 Gray, 54; *Womrath* v. *McCormick,* 51 Pa. St. 504.

As to what is a vested remainder, see *Williamson* v. *Field,* 2 Sandf. Ch. 607; *Van Dyke's Admr.* v. *Vanderpool's Admr.* 14 N. J. Eq. 204; *Brown* v. *Lawrence,* 3 Cush. 390; *Forsythe* v. *Rathbone,* 34 Barb. 406; *Pike* v. *Stephenson,* 99 Mass. 188; *Wright* v. *Shaw,* 5 Cush. 56.

As to the point that the estate in the issue of the testator's daughters was contingent, at his death, on there being such issue, and that if there had been such issue it would at once have become vested, not waiting for the death of the daughters, and if such issue had died during the life of the parent, under the statute, irrespective of the provision to that effect in the will, such vested estate would have descended to the heirs of such issue, may be cited *Sisson* v. *Seabury,* 1 Sum. 235; *Doe* v. *Perryn,* 3 Durn. and E. 484; *Sturgess* v. *Pearson,* 4 Madd. 411; *Harrison* v. *Foreman,* 5 Ves. J. 207; *Hempstead* v. *Dickson,* 20 Ill. 193; *Kennedy* v. *Sedgwick,* 3 K. and J. 540; Theobold, 381.

For a long time—a period of over a hundred years—the English courts held, almost uniformly, that in the absence of expressions strongly indicating a contrary intent, words of survivorship in a will related to the death of the testator, and not to the period when the precedent estate should be determined, though the distribution should be referred to a different period. The cases are collected in *Morse* v. *Lyon,* 25 Wend. 118, and among them are *Stringer* v. *Phillips,* 1 Eq. Cases Ab. 293; *Wilson* v. *Boyly,* 3 B. P. C. 195; *Roebuck* v.

*Dean,* 2 Ves. Jr. 265; *Maberly* v. *Strode,* 3 id. 450; *Brown* v. *Bigg,* 7 id. 279 b; *Perry* v. *Woods,* 3 id. 204; *Garland* v. *Thomas,* 1 Bos. and Pull. N. R. 82; *Edwards* v. *Symons,* 7 Taunt. 212; *Baker* v. *Giles,* 2 P. Wms. 280; *Trotter* v. *Williams,* Prec. in Ch. 7; *Doe, etc.* v. *Prigg,* 8 Barn. and Cress. 231.

And the courts of Virginia, Pennsylvania, New York and Georgia have adopted the same rule. *Morse* v. *Lyon,* 25 Wend. 118; *Johnson* v. *Morton,* 10 Barr, 245; *Ross* v. *Drake,* 37 Pa. St. 373; *Hansford* v. *Elliott,* 9 Leigh, 75; *Martin* v. *Kirby,* 11 Gratt. 67; *Vickers* v. *Stone,* 4 Ga. 461.

The cases cited by the appellants are most of them easily resolvable into one of the three following classes:

In one, the corpus of the estate to be distributed was not in existence until the death of the tenant for life, or else it was only what remained after the death of the tenant for life, and for such reason it was held that there was no vesting until that event occurred. To this class belong *Houghton* v. *Whitgrave,* 1 Jac. and W. 146; *Brograve* v. *Winder,* 2 Ves. Jr. 634; *Newton* v. *Ayscough,* 19 id. 534; *Montague* v. *Corneal,* 1 A. K. Marsh. 259; *Sinton* v. *Boyd,* 19 Ohio St. 30; *Jennings* v. *Jennings,* 44 Ill. 488; *Hearn* v. *Baker,* 2 K. and J. 383; *Williams* v. *Tartt,* 2 Coll. 85; *Ridgeway* v. *Underwood,* 67 Ill. 419; *Teed* v. *Morton,* 60 N. Y. 506.

In the second, the words of the will so plainly showed the intent of the testator, as fairly to require, if not compel, the construction put upon them. To this class belong the cases of *Knight* v. *Poole,* 32 Beav. 548; *Edwards* v. *Edwards,* 15 id. 357; *Cambridge* v. *Rous,* 25 id. 409; *Leake* v. *Robinson,* 2 Meriv. 363; *Locke* v. *Lamb,* 4 Law R. Eq. 572; *Merry* v. *Hill,* 8 id. 619; *Newman* v. *Newman,* 10 Simons, 51; *Hawes* v. *Hawes,* 1 Ves. Sr. 12; *Duffield* v. *Duffield,* 3 Bligh, 260; *Verley* v. *Richardson,* 8 DeG. M. and G. 126; *Tier* v. *Pennell,* 1 Edw. Ch. 354; *Thompson* v. *Luddington,* 104 Mass. 193; *Olney* v. *Hull,* 38 id. 311; *Holcomb* v. *Lake,* 4 Zabr. 686; *Robertson* v. *Wilson,* 38 N. H. 48; *Williams* v. *Haythorne,* 1 Ch. App. (L. R.) 782; *Stephens* v. *Evans,* 30 Ind. 39.

In the third, the gift to the survivors was held to refer to survivors at the period of distribution, and not at the death of the testator, because another subject matter given to the same objects was expressly so limited.   To this class belong *Daniel* v. *Daniel,* 6 Ves. Jr. 297; *Hawes* v. *Hawes,* 1 Ves. Sr. 13.

When the original gift is not vested, but contingent upon the happening of another, the non-occurrence of which is the occasion of the alternative gift over, survivorship is almost necessarily referable to that event, whenever it may happen.   2 Jarman on Wills, (3d ed.) 694; *Carver* v. *Burgess,* 18 Beav. 541; *Wilmot* v. *Flewitt,* 11 Jur. N. S. pt. 1, 821; *Crowder* v. *Stone,* 2 Russ. 217; *White* v. *Baker,* 2 DeG. F. and G. 55; *Ive* v. *King,* 16 Beav. 46.

A devisee may renounce and disclaim a devised interest, and thereupon it will descend to the heir, or pass to the remainder-man.   *Doe dem. Smyth* v. *Smyth,* 6 Barn. and Cress. 112; *Town* v. *Tickell,* 3 Barn. and Ald. 31; *Temple* v. *Nelson,* 4 Metc. 584; *Bugbee et ux.* v. *Sargent et al.* 23 Me. 269.

Although an ulterior devise is in terms not to take effect in possession until the decease of the prior devisee, if tenant for life, or his decease without issue, if tenant in tail, still, in point of fact, it is to be read as a limitation of a remainder, to take effect in every event which removes the prior estate out of the way.   1 Jarman on Wills, 539; *Adams* v. *Gillespie,* 2 Jones' Eq. 244; *Holderly* v. *Walker,* 3 id. 46; *Piercy* v. *Piercy,* 19 Ind. 467; *Macknet* v. *Macknet,* 24 N. J. Eq. 292; *Darcus* v. *Krump,* 6 B. Mon. 365; *Woods* v. *Woods,* 1 Metc. (Ky.) 516; Theobold, 450; *Fuller* v. *Fuller,* 1 Cro. pt. 1, 422; *Hutton* v. *Simpson,* 2 Vern. pt. 2, 721; 1 Shepherd's Touchstone, 435; *Lainson* v. *Lainson,* 18 Beav. 1; 5 DeG. M. and G. 754; *Eavestaff* v. *Austin,* 19 Beav. 591; *Yeaton* v. *Roberts,* 8 Foster, 459; *Waddle* v. *Terry et al.* 4 Coldw. 51; *Armstrong* v. *Park's Devisees,* 9 Humph. 195; *Craven* v. *Brady,* 4 L. R. Eq. 209; *Jull* v. *Jacobs,* 3 L. R. Ch. Div. 703; *Fox* v. *Rumery,* 68 Me. 121.

There is nothing in the words "pay," "divide," or "divide and distribute," that necessarily defers the gift to the period of actual enjoyment. *Jull* v. *Jacobs*, 3 L. R. Ch. D. 703; *Salmon* v. *Grier*, 11 Beav. 453; *Chaffers* v. *Abell*, 3 Jur. 577; *Corneck* v. *Wadman*, 7 L. R. Eq. 80; *Phipps* v. *Ackers*, 9 Clark & F. 583*; *Leeming* v. *Sheratt*, 2 Hare, 17; *Packham* v. *Gregory*, 4 id. 395; *Thompson's Trusts*, 5 DeGex & S. 667; *Carver* v. *Jackson*, 4 Pet. 1; *Williamson* v. *Field*, 2 Sandf. Ch. 533; *Shrimpton* v. *Shrimpton*, 31 Beav. 425.

Messrs. LAWRENCE, CAMPBELL & LAWRENCE, also for the appellees:

It is claimed by the learned counsel on the other side, that the period of distribution will not arrive until the *physical death* of the widow, notwithstanding the fact that she is *dead as to the will*, by having renounced it and taken her dower.

The claim made by our associates and ourselves is, that the period of distribution arrived *at the expiration of the life estates*—that is (the widow having renounced the will), at the death of the testator's surviving daughter; and we further claim that this conclusion, while it follows from a careful examination of the general doctrine concerning the vesting of contingent remainders, is absolutely demonstrable under the rule of "acceleration," and is thus reached by a plainer and shorter road.

The courts hold, in favor of the rule of "acceleration," that when a testator has given an estate for life to A, with remainder over on the death of the life tenant to a person or a class, he intended the remainder should vest at the end of the life estate, although that estate might have ended from some other cause than the physical death of the life tenant. It must of course be presumed, in the absence of an express provision by the testator to the contrary, that his only reason for postponing the taking by the remainderman, was that the tenant for life might take and enjoy the estate so long as he might be capable of doing so; and

therefore, if the tenant for life can not or will not take, the remainder-man should be permitted to do so.

The counsel entered upon an elaborate examination and discussion of the authorities quoted by their associates and by the opposing counsel, and applying the rule laid down by Jarman,—though the ulterior devise is, *in terms,* not to take effect in possession until the decease of the widow, yet in point of fact, *it is to be read* as a limitation of a remainder to take effect in every event *which removes the prior estate out of the way:*—both daughters of the testator having died unmarried, and the widow having renounced the will, these events have "removed the prior estate out of the way," and the period of distribution has arrived. As specially illustrative of this rule, reference was made to *Jull* v. *Jacobs,* 3 Law Rep. Ch. Div. 703.

Finally, from the whole case, the counsel deduced the following propositions:

1. Where a testator uses in his will a phrase having a fixed, well defined, legal meaning, the courts will, in construing the instrument, give the phrase this meaning, unless to do so would be a plain and palpable perversion of the intention of the testator, as shown in other portions of the will. The authorities cited show that the words "after the decease of my wife," used in this will, mean, "after the termination of her life estate," and this legal signification will not be abandoned by the court, except in obedience to the plainest expression in the will of some intent which would be thwarted by adhering to such legal signification.

2. So far from the testator having expressed or indicated in other parts of his will another intent, which will be thwarted by adhering to the legal signification of these words, the whole scheme of the will, and the objects which the testator evidently had most at heart, plainly show that his intentions will be thwarted if the court does not adhere to the legal signification.

3. The letter of the will, as well as its spirit and intent, requires the construction contended for by appellees.

Mr. Justice Sheldon delivered the opinion of the Court:

This case is one involving the construction of a will.

Walter L. Newberry, a citizen of Chicago, made his will on the 30th day of October, 1866, and died November 6, 1868. He left a widow and two unmarried daughters. By his will he devised and bequeathed unto two trustees his whole real and personal estate, after payment of certain specific legacies of inconsiderable amount, to be held upon the general trusts declared in the will until its distribution by them to the persons ultimately entitled,—the will containing careful directions governing during this period the administration of the estate and its income. The estate was a very large one, of the estimated value of from four to five millions of dollars.

The will provides for an annual payment by the trustees of ten thousand dollars to the wife of the testator, and also gives to her certain articles of personal property, such as furniture, horses and carriages, books and paintings, and a life estate in the homestead situated in the city of Chicago, on the condition that she would consent to accept the same in lieu of her dower right and all other right in the estate.

The remainder of the net income of the estate was to be divided by the trustees equally between the two daughters, for life, with benefit of survivorship between them in such income.

After their lives and that of the wife, the whole of the estate was to be by the trustees divided equally amongst and distributed to the children of the daughters, the child or children of either taking the whole in default of lawful issue of the other. There is then this further provision, upon which the question arises:

"In case of the death of both of my said daughters, without leaving lawful issue, then immediately after the decease of my wife, if she survive my said daughters, but if not, then immediately after the decease of the last surviving one

of my said daughters, my said trustees shall divide my estate into two equal shares, my said trustees being the sole judges of the equality and correctness of such division, and shall at once proceed to distribute one of such shares among the lawful surviving descendants of my own brothers and sisters, such descendants taking *per stirpes* and not *per capita.*

" The other share of my estate shall be applied by my said trustees, as soon as the same can consistently be done, to the founding of a Free Public Library, to be located in that portion of the city of Chicago now known as the North Division."

Both of the daughters have died without issue and unmarried, one dying in February, 1874, the other, Julia, in April, 1876. The widow of the testator is still living. She, within one year, renounced her rights under the will, and took, under the law of Illinois, one-third of the personalty, and her dower in the realty.

Eight nieces and nephews and ten grand nieces and nephews of the testator (the parents of the latter being dead), living at the death of the last daughter, Julia, constitute the complainants in the bill in chancery herein, which was exhibited in the circuit court of Cook county, asking a present distribution of the estate. The court below granted the prayer of the bill, and the defendants appealed.

The question for determination is, can there be now, during the lifetime of Mrs. Newberry, a legal division of the estate by the trustees, one-half to the descendants of the testator's brothers and sister, and the other half to the public library.

Complainants claim, that upon the death of the last daughter without issue, the class to whom the devise was in part made, viz: the lawful " surviving descendants " of testator's brothers and sister was in existence and capable of taking. That at that time the estate became vested in the members of the class; that the testamentary life estate which was given to the widow by the will was the impediment to the distribution of the estate until the death of the widow, and the reason of

the postponement of the distribution until that event; that such life estate having been extinguished by her renunciation, it is, as to the complainants, the same as if her life had come to an end, and that the remainder to them was accelerated, under the doctrine of the acceleration of remainders, so that they became entitled to immediate enjoyment thereof.

The defendants assert that the death of the widow is fixed by the will as the time when the division and distribution by the trustees shall be made; and further, that no distribution can be made till then, because they say that that time enters into the description of those who are to take,—that the devise over is to those descendants only who survive the death of the wife, and until that time it can not be ascertained who the donees under the will are.

Who are the donees in this devise to whom one-half of this estate is to be distributed?

They are a class of "surviving descendants" of the testator's brothers and sister. The members of this class are to be determined by the event or time to which the word "surviving" relates.

There are three periods here to which it may be claimed to relate, the death of the testator; the death of the last daughter, Julia Newberry, without issue; or the time appointed for the distribution upon the death of Mrs. Newberry. However it may have been at some former time, we understand the rule now prevailing to be, that where a gift to survivors is preceded by a life or other prior interest, it takes effect in favor of those who survive the period of distribution, and those only.

In *Knight* v. *Poole*, 32 Beav. 548, there was a bequest to A, and at his death to B, and at "her decease" to be divided among four named persons, or "as many of them as may be living." The question was, at what time the persons to take must be living, for some survived one of the tenants for life, and died before the other. Sir JOHN ROMILLY, the Master of the Rolls, said: "I am clear that no person took except

those who survived the period of division.    There is a gift
of property to A for life, and at his death (with certain
exceptions) to B, and at her death it is to be divided between
the surviving brothers and sisters who are named.    The case
of *Cripps* v. *Wolcott* clearly applies, and only those who sur-
vived both A and B could take.    The property is to be 'divi-
ded,' and nobody was to take who was not living at the period
of division.    *    *    *    I am of opinion that the words in
question have relation to the period of division, and that the
plaintiff takes no interest in the property."

In *Stevenson* v. *Gullan*, 18 Beav. 590, there were bequests
to two for their lives, and, from and after their decease, to
their "surviving children."    One of the tenants for life had
seven children living at the death of the testatrix; six were
living at his own death, but only four were living at the
death of the other tenant for life.    The question was, to what
period the word "surviving" must be referred.    Sir JOHN
ROMILLY, the Master of the Rolls, remarked: "The survivor-
ship must be referred to the death of the last of the tenants for
life, which is the period of distribution.    Where the income
of a fund is given to tenants for life, and there is a gift over
after their deaths to children, or a class of persons surviving,
it is a gift to those only who are then surviving."

In *Spurrell* v. *Spurrell*, 11 Hare, 54, the testatrix, by will,
gave all her property whatsoever to her mother for life, and
after a legacy of two hundred pounds, then the residue of any
property to be equally divided between any surviving
brothers and sisters, share and share alike.    Sir W. PAGE
WOOD said: "I think the word 'surviving,' in this will as
applied to the brothers and sisters of the testatrix, must
mean surviving at the time of the distribution of the fund.
The word was capable of receiving four different construc-
tions, which were suggested in the argument.    *    *    *    I
think it better that the court should hold that there is no
rule referring the time of survivorship of the legatee to the
death of the testator.    The natural inference is rather the

other way, and the court must ascertain the true meaning of the testator after looking at every portion of his will. * * It seems to me that the period to which the word 'surviving' refers, is the period when the fund came to be distributed—when the event has happened which is to guide the executors in making distribution."

In *Young.* v. *Robertson,* 8 Jur. N. S. 825, this question arose in 1862 in the House of Lords. The testator directed his estate, real and personal, to be divided equally among his grand-nephews and grand-nieces. The Lord Chancellor there said : "Now, I apprehend it to be a settled rule of construction, and in itself a very reasonable and natural rule, that words of survivorship occurring in a settlement (that is, a will) should be referred to the period appointed by that settlement for the payment or distribution of the subject matter of the gift. That, undoubtedly, is the rule that is now finally established in this country. * * * The result, therefore, is, that in the event of such a gift the survivors are to be ascertained in like manner by a reference to the period of payment or of distribution, namely, the expiration of the life·estate." Numerous other like cases might·be cited.

This court recognized and applied the above rule in *Ridgeway et al.* v. *Underwood et al.,* 67 Ill. 419, where, after referring to 2 Jarman on Wills, 3d Am. ed. 462, and *Marriott* v. *Abell,* 7 Law Rep. Eq. Cas. 478, as authorities to show the existence of such a rule of construction, it was said : "Here was a 'prior interest' which was to be extinguished by lapse of time before the land could be sold. The land was then to be sold and the proceeds divided between certain·of the children. Here, then, applies, with literal exactness, the rule expressed by Jarman. The will provides for survivorship. It is indefinite in its terms, and the rule solves the doubt by applying the language of the testator to those who survive the period of distribution." In *Linton* v. *Boyd,* 19 Ohio St. 30, the court, after citing the case of *Young* v. *Robertson,*

*supra,* and the statement of the rule there, that words of survivorship should be referred to the period appointed for the payment or distribution of the subject matter of the gift, observed: "This, undoubtedly, is the general rule recognized in this country, subject, of course, to such modifications as the paramount rule giving effect to the intention of the testator may require." And see *Olney* v. *Hull,* 21 Pick. 311; *Teed* v. *Morton,* 60 N. Y. 503, and cases cited in note (y) 2 Williams on Executors, 1576, 7th ed.

We find it then to be the settled rule of law that, as expressed in *Cripps* v. *Wolcott,* 4 Madd. 12, "surviving" means surviving at the time of the distribution and possession of the estate, unless a special contrary intent is found in the will. We do not find any such contrary intent in this will.

The form of the gift here, too, there being none except *in the direction to distribute,* adds to the strength of the rule in confining the reference of the words of survivorship to the time of distribution. The significance which the authorities attach to such a form of gift will be found to be as laid down in *Leake* v. *Robinson,* 2 Meriv. 363. There was there a direction to trustees, in case Wm. Rowe Robinson should die without issue, to pay, apply and transfer unto and among all and every his brothers and sisters, share and share alike, upon their attainment of 25, or marriage, respectively. The question was whether those only were the donees who lived until 25 and attained the period of actual payment and transfer, or whether that was merely a time fixed for payment of shares that had vested at some antecedent period.

The Master of the Rolls, Sir WM. GRANT, said: "There is no direct gift to any of these classes of persons. It is only through the medium of directions given to the trustees that we can ascertain the benefits intended for them. * * * There being, as I have already said, no direct gift to the grand-children, we are to see in what event it is that the trustees are to make it over to them. * * * The attain-

ment of 25 is necessary to entitle any child to claim a transfer. It is not the enjoyment that is postponed; for there is no antecedent gift, as there was in the case of *May* v. *Wood,* of which the enjoyment could be postponed.    The direction to pay is the gift, and that gift is only to attach to children that shall attain 25.  *  *  *    None but a person who can predicate of himself that he has attained 25, can claim anything under such a gift."

Under the form of gift here there is no gift to any one except such as are *surviving* and capable of taking at the time of distribution.   Surviving at the time of distribution is a part of the description given by the will of the donees, and there is no gift to any one who does not answer the description in this element of time,—who is not at that time living. The donees then, here, are the descendants living at the time of distribution, whenever that time may be, and not those living at the death of the daughter, Julia Newberry, unless that event should be coincident with the time of distribution. Until the time of distribution it is uncertain who will be alive to take then, and until that time arrives it can not be ascertained and made certain who the donees are.

To a similar effect are *Vawdry* v. *Geddes,* 1 Russ. and Myl. 203; *Locke* v. *Lamb,* 4 Law R. Eq. 372; *Drake* v. *Pell,* 3 Edw. Ch. 267.

In Smith's Executory Interests, § 281, it is laid down that "where real or personal estate is devised or bequeathed to such of the children, or to such child or individual as shall attain a given age, or the children, etc., who shall sustain a certain character, or do a particular act, or be living at a particular time, without any distinct gift to the whole class, immediately preceding such restrictive description; so that the uncertain event forms part of the original description of the devisee or legatee,—in such case, the interest so devised or bequeathed, is necessarily contingent on account of the person.    For, until the age is attained, the character sustained, or the act performed, the person is unas-

certained ; there is no person in *rerum natura* answering the
description of the person who is to take as devisee or legatee."

We find it unnecessary to enter into the discussion of the
doctrine of contingent and vested remainders, the learning
pertaining to which was so elaborately gone into by counsel
in the argument.   For, even conceding the claim of the com-
plainants that survivorship here is to be referred to the death
of the last surviving daughter without issue, and that upon
that event the devise to the surviving descendants of the
testator's brothers and sister ceased to be a contingent and
became a vested estate in the descendants then living,—still,
unless the time of distribution has arrived, complainants can
not maintain their bill for present distribution.   And if the
time for distribution has in fact arrived, the defendants'
claim that the devise is contingent as to person would seem
to be of force no longer, as that contingency would have been
determined, and the donees have become ascertained by the
arrival of the period of distribution.   So that we are brought
to that which at last is the prime inquiry in the case, what is
the time of distribution under the will?  Has the period of
distribution arrived?

The time appointed by the testator, in the contingency
which has happened, the death of both daughters without
issue, when the trustees should divide his estate into two
equal shares, and at once proceed to distribute one of such
shares among the lawful surviving descendants of his brothers
and sister is, "immediately after the decease of my wife."
Complainants say, by the renunciation of the widow, their
remainder has become accelerated, under the rule of accelera-
tion of remainders, so that it is as if the widow were dead,
and that thus the appointed time of distribution has arrived.

This doctrine of acceleration is stated by Theobold thus:
" Where there is a gift to A for life, and after his death to
B, if A is incapable of taking, because he is an attesting
witness, or from any other cause, or if he refuses to take, the
remainder is accelerated.   The same is the case if the life

estate is revoked by the testator, or determined by a forfeiture clause." Theobold on Constr. of Wills, 450.

Jarman says, (1 Jarm. on Wills, 3d ed. 539): "The doctrine evidently proceeds upon the supposition, that though the ulterior devise is in terms not to take effect in possession until the decease of the prior devisee, if tenant for life, or his decease without issue if tenant in tail, yet that, in point of fact, it is to be read as a limitation of a remainder to take effect in every event which removes the prior estate out of the way."

In *Jull* v. *Jacobs*, L. R. 3 Ch. Div. 711, it is laid down: "That a gift to A for life, and from and after the decease of A, to B, C, D or anybody else, means from and after the determination of the estate; and whether the estate is determined by revocation or by death, or by the incapacity of the devisee to take, or by any other circumstance, the life estate being out of the way, the remainder takes effect, having only been postponed in order that the life estate may be given to A."

This doctrine of acceleration, however, is not an arbitrary one, but it is founded on the presumed intention of the testator that the remainder-man should take on the failure of the previous estate, notwithstanding the prior donee may be still alive, and is applied in promotion of the presumed intention of the testator, and not in the defeat of his intention. And when it is the evident intention of the testator that the remainder should not take effect till the expiration of the life of the prior donee, the remainder will not be accelerated.

The further language of Vice Chancellor MALINS, in deciding the case of *Jull* v. *Jacobs, supra,* shows clearly and fully the principle which governs this doctrine of acceleration. He said: "It is perfectly clear, in the first place, that the children are postponed to the mother, simply because the mother is to have the property for her life; but if the mother can not have the property for her life, why are the children to be postponed? The reason of their postponement altogether ceases; they are not to have it until after her death, because

the testator assumed that she would have it during life. But he was ignorant of the law, that if he called in his daughter to be an attesting witness, the very gift he made to her would absolutely fail. Now he has postponed his grandchildren,— that is, his daughter's children, solely because the daughter was to take for life, and if he had known that she could not take it for life, he would not have postponed the children until after her death. He would not have left her and her family totally destitute in the meantime. It is a mere accident that the daughter can not take the life estate, and I am of opinion that the children are postponed to the daughter simply that she may have the property for life, and if she could not have it for life, the children would have had it immediately."

In *Augustus* v. *Seabolt*, 3 Met. (Ky.) 155, where a prior life estate devised had failed, the devisee for life still living, the court refused to accelerate the remainder, because to do so would violate the plain language of the testator, and might defeat his will, by letting in, as devisees, persons not intended to be the recipients of his bounty—the words of the devise over in remainder being, after the death of the devisee for life to a class of children, or such of them as might be living at the time of the death of such devisee.

In *Estate of Matthew Delaney*, 49 Cal. 76, the testator devised his residue of estate to his executor, with directions to sell certain realty, and, after certain payments, to invest the proceeds remaining; to pay certain income to his children and wife during her life; and on the death of his wife, to distribute the estate among his surviving children. The widow renounced the provisions of the will, and claimed under the statute. After such renunciation, the executor sold a large part of the realty. Afterward, the estate being in condition to be closed, one of the three children claimed, in her petition, that by the renunciation the trusts in the executor were defeated, and that that portion of the estate devised to the executors in trust became subject to distribution among

the heirs at law, in the same manner as if the said Matthew
Delaney had died intestate.   So that she was entitled to dis-
tribution of the lands which had been sold by the executor
after the renunciation.     The court denied this claim,
and upheld the conveyances made by the executor after the
renunciation, saying : " The will devised to the executor the
fee of the lands in question to be held in trust for the purpose
mentioned in the will.   The renunciation by the widow of
the testator of her right under the will, and the order of the
probate court setting off to her a portion of the property as
common property, did not extinguish the trusts declared in
the will, nor divest the executor of the fee in the remaining
portion of the property.   The executor retained the same
power over the portion of the estate remaining in his hands
after the renunciation by the widow, and the setting apart
the property to her, that he possessed prior to the renun-
ciation."

As respects the intention of the testator, which is to be
regarded in the interpretation of a will, it is not the intention
to be deduced from speculation upon what the testator may
be supposed to have intended, but it is the intention as spoken
by the words of the will.

In 2 Williams on Exrs. (7th ed.) 1078 marg. it is laid down:

"The use of the expression that the intention of the testator
is to be the guide, unaccompanied with the constant explana-
tion that it is to be sought in his words, and a rigorous atten-
tion to them, is apt to lead the mind insensibly to speculate
upon what the testator may be supposed to have intended to
do, instead of strictly attending to the true question, which
is, what that which he has written means."

As bearing upon the testator's intention, there are other
words of the will which should be considered, as :

"In case of the death of both my said daughters, without
lawful issue, it is my will that thereafter the portion of my
estate, both principal and interest, which would have be-
longed to them respectively, in case they or either of them

had survived, shall revert to and become a part of my estate. And it is my will, and I direct, that in the case of each and every bequest, and of every instance in which I have directed my Trustees to pay over money to any person or persons whomsoever, if the person or persons to whom or for whose benefit I have made such bequests, or directed money to be paid as aforesaid, shall have deceased, or from any cause be incapable of taking, then the amount so bequeathed, or so directed to be paid over, shall revert to and become a part of my estate, unless I have otherwise specifically directed."

The bequest and payment of money mentioned in the last sentence above would include this testamentary provision offered to Mrs. Newberry by the will, if she would consent to take the same in lieu of her dower, which she became incapable, by her election, of taking, and it is declared what shall be the effect of not taking this provision; and it is, that what is embraced within it "shall revert to and become part of my estate;" and this is all the effect which is anywhere intimated in the will shall follow from not taking this provision. There is no hint of an intention that it shall hasten or in anywise affect the expressed time of the distribution. The two sentences last above given embrace the exact case which is now presented here, to-wit, the death of both the daughters without issue and the failure of the wife to take the testamentary provision, and the testator declares what the effect shall be—which is, not that there shall be immediate distribution, but that the bequests to the daughters and the failing bequest to the wife shall revert to and become a part of his estate, with the intention presumably, that they should be and remain such, in the hands of the trustees, to be cared for and managed by them until the appointed time for the distribution should come, viz., the death of the wife.

Had it been the intention of the will, that on the failure of the wife to take the testamentary provision, and the daughters dying without issue, there should then be immediate distribution, here, where that very case was mentioned, would

have been a most fitting place to have signified such intention ; but there is no intimation that way.

The last sentence of the above clause shows that the period of distribution was not fixed at the termination of their lives, simply that the life tenants might enjoy the property, because after the death of the daughters without issue, the widow, if she took under the will, would take the use and income of but a small portion of the property, and the rest, in accordance with the express provision of the testator, would be held by the trustees for accumulation.

"In case of the death of both or either of my daughters, during the lifetime of my wife, leaving lawful issue living, it is my will, and I direct, that such lawful issue shall have and receive from my said trustees the portion of the net income from my estate which would have belonged to that one of my daughters from whom they are descended, had she survived," etc.

To this issue, not only the income, but the whole principal is given at the time of final distribution, and the time of distribution to them is fixed the same as it is to the descendants of the testator's brothers and sister, viz., the termination of the three lives of the daughters and wife. Now supposing this contingency of the death of both daughters during the lifetime of the wife, leaving lawful issue living, say minor issue, had happened, and a claim like the present for immediate distribution had been set up in behalf of such minor issue, could it then have been successfully claimed, that as the widow had not taken the testamentary provision, the estate of the trustees had ceased and guardians of the minor issue should be appointed and the capital of the estate be at once turned over by the trustees ? The testator had selected his own guardians for this property, these trustees, and the estate during the life of the wife was to be cared for and managed by these persons of his own choice, under the specific directions which he had himself given, and the estate with its accumulations as thus managed was to be passed over direct from the

hands of these trustees to the children. Must we not suppose this to have been the intention of the testator and that it was not the intention that the estate should be turned over by the trustees into the hands of guardians appointed by the court to be managed by them during the wife's life, according to their own notions, and not in the way the testator had directed, with the liability of depreciation and waste of the property from the mismanagement of such guardians? Has not one the right to provide as to the management of his property in such case, and does not this appointment of trustees look to that end, and is it not to be upheld accordingly? Further, in such event of the decease of both daughters during the wife's lifetime, leaving lawful issue living, there should be an immediate distribution to the daughters' children, according to appellees' claim that renunciation was the same as death in this regard; but this clause of the will says that in that event the trustees shall pay over to the children the daughters' portion of the *net income,* thus implying that the estate is to continue in the trustees, and that the income is to continue to be paid to the children during the wife's lifetime until the time comes for distribution, viz., the wife's death. If the taking of the testamentary provision had been the sole reason for postponing the distribution until the wife's death, would there not have been some reference to that circumstance in this place—the uncertainty of the accepting of that provision being so vividly before the testator's mind—such as that the income should be paid to the children in case the testamentary provision should have been accepted, or that if it had not been accepted, there should be then an immediate distribution of the estate to the children? This would have been natural had the circumstance of taking the bequest been the sole reason for fixing the time of distribution at the wife's death.

"In the management and conduct of my estate by my said Trustees, it is my will, and I direct, that the following described premises and property, situate, lying, and being in

the city of Chicago aforesaid, to-wit: Blocks numbered nine (9), ten (10), eleven (11), and eighteen (18), in Newberry's addition to Chicago, and lots twenty-two (22), twenty-three (23), twenty-four (24), twenty-five (25), and twenty-six (26), all in block numbered one (1), in Butler, Wright and Webster's addition to Chicago, and sublots one (1), two (2), and three (3), of lot five (5), in block numbered four (4), of the original town of Chicago, shall not be sold or mortgaged by my said Trustees during the lifetime of my wife and daughters, or either of them, nor until it shall become necessary for my said Trustees to divide and make final division and distribution of my estate as hereinbefore in this my will provided."

Then follow careful provisions and directions concerning the powers and discretion of the trustees covering leases, sales of realty, the improvement of the estate by the trustees by the erection of "stores, dwellings, hotels, offices of all kinds," as they may judge best for the interest of the estate, and that the premises above described shall be first improved.

Provision is made in regard to investment by the trustees of moneys of the estate, directing the particular securities in which the investments shall be made.

Thus large powers of control and management were given to the trustees, almost those of an absolute owner; and this clause of the will imports that there were to be extensive improvements made by the trustees, implying the continuance of the estate in the trustees for a considerable length of time, which might well be for so long a time as the duration of three lives, and the provision would not comport with any short time of holding the property. This clause, too, recognizes in terms the time of the duration of the estate in the trustees to be "during the life-time of my wife and daughters."

The following provisions, which make the bequest to the wife, show that the testator contemplated that his wife might renounce the will, and hold to her statutory estate:

" It is my will and desire to make provision for my beloved wife, Julia Butler Newberry, provided she consents to accept of the same in lieu of and instead of her dower right, and all other right, claim and demand to my estate, or any part thereof, in the following manner: I give and bequeath to her, etc., (naming the bequest made to her.) None of the aforegoing provisions for the benefit of my wife shall be operative or have any effect, but the same shall all and singular be inoperative and void, unless she shall, within twelve (12) months after my decease, relinquish in due form of law all claim to my estate."

Now, bring the provisions of this will side by side with the language of the Vice Chancellor above cited in the case of *Jull* v. *Jacobs,* and apply to them the reasoning which was there employed. As was there said with reference to the facts of that case, can it be said here, that it is perfectly clear that the distribution is postponed to the death of Mrs. Newberry, simply because she was to have this particular testamentary provision for life? That the reason of such postponement altogether ceases, because of her not accepting that provision? That the postponement to her death was solely because she was to take this testamentary provision for life, and that, if the testator had known that she would not take that provision for life, he would not have postponed the distribution until after her death? There was here no absolute gift to Mrs. Newberry for life, but a conditional one only, the very form of it showing consciousness that it might not be accepted. It will be seen that the testator first declares his will and desire to make provision for his wife, *provided* she consents to accept of the same in lieu of her dower right. He then makes the bequest to her before named. And then immediately following says: "None of the aforegoing provisions for the benefit of my wife shall be operative or have any effect, but the same shall all and singular be inoperative and void, unless she shall, within twelve months after my decease, relinquish in due form of

law all claim to my estate." All this shows that the failure
to take this testamentary provision was not an unforeseen, or
unanticipated event, but that it was present to the mind of
the testator and in his distinct contemplation that his wife
might not take this provision. He knew that she would
have a life estate of dower, and he offered her by his will this
annuity of $10,000 for her life if she would take it in lieu of
the dower estate; and it was not only once, but repeatedly
declared that this testamentary provision should be void,
unless accepted in lieu of dower; and it was to be void,
unless a formal relinquishment of dower should be made by
the widow within twelve months after the testator's decease.
It was uncertain to the mind of the testator whether
his wife would or not comply with this prescribed condition
and take this provision of the will, and he distinctly con-
templated that she would have a life interest, either of the
annuity provided by the will, or of dower, with an entire
uncertainty before his actual view whether it would be the
one or the other.

Thus seeing, he wills that the distribution shall be made
"immediately after the decease of my wife." What reason
for saying that the not taking this testamentary provision is
the equivalent of the wife's decease; that now, upon the
death of the two daughters without issue, is the time of dis-
tribution under the will?

When, as here, there is a dower estate, and a testamentary
estate given for life on condition that it shall be accepted in
lieu of dower, and expressly providing that the gift shall be
void unless there be a formal relinquishment made of the
dower estate within a specified time, and then the simple
direction, without more, that the final distribution of the
estate shall be upon the death of the wife, that event is the
time for the distribution, we consider, whether the testament-
ary provision be accepted or not. The wife's death being
fixed as the time of distribution in distinct view of there
being the life estate of dower and of the uncertainty whether

the provision of the will would be accepted in lieu of dower or not, whether the life estate of the annuity, or that of dower, would be the one the wife would have and enjoy, it manifests the intention that the wife's death should be the time of distribution, whichever the event might be, whether she accepted or declined to accept the provision of the will in lieu of her dower estate.

If it had been otherwise, if the intention had been that if the wife did not elect to take this testamentary provision in lieu of her dower, that then the distribution should take place on the death of the last surviving daughter without issue of either, why did not the will so say, as this contingency of not taking the bequest was in the actual view and contemplation of the testator. The will is a very carefully drawn one. It seems to make provision for almost all possible contingencies which might be supposed to arise.

And if this time of distribution, upon the wife's death, had not met and covered the contingency of her not taking the testamentary provision and been expressive of the intention of the testator in that contingency, it is inconceivable that there should not have been some expression in the will that there should be a different time of distribution in the case of that contingency, it having been so distinctly in the view of the testator.

The intention of the will, as we find, is, that the time of distribution should be the wife's death, whether she did or did not take this testamentary provision. And this intention is not deduced solely from the words used, that the distribution shall be " immediately after the decease of my wife," but it is manifested from other provisions of the will. The intention of the will must govern. No artificial rule of construction can be allowed to prevail over the intention. Surely, if the will had expressed that the wife's death should be the time of distribution, whether she accepted the testamentary provision or not, the rule of acceleration invoked by appellees' counsel would not be suffered to change this

fixed time of distribution.    The intention of the will that the wife's death should be the time of distribution, whether the testamentary provision was accepted or not, seems to us to be satisfactorily manifested from the provisions of the will, and almost as much so, as if there had been such expression of it as above, in terms.

The rule upon the subject of the acceleration of remainders relied upon by appellees' counsel as authority to change the fixed time of distribution in this case, namely, that when there is a gift to A for life, and after his death to B, if A is incapable of taking, or refuses to take, then the remainder is accelerated and takes effect, is in agreement with the manifest intention of the testator.    It is in such case the testator's intention that A and B shall take the whole estate; that he shall die testate as to all of it, and that no part of it shall go as intestate estate.    Now, if on A not taking, the estate should go during A's life to some one else than A or B, the testator's intention that they should have the entire estate between them, and that none of it should pass as intestate estate to any one else, would be disappointed.    That the estate should go immediately to B, on A not taking, is carrying out the palpable intention of the testator that the two should take the whole estate.    But the rule would not apply if there was the expression of a contrary intent.    Any expressed intention would be paramount to the rule.

No question is made as to this general rule.    But how different is it here in the present case?    On the failure of the wife to take the offered bequest, there would be no dying intestate as to that, and no passing of it to some one else whom the testator did not intend, but it would go to his devisees, the trustees, to be held for those ultimately entitled to it under the will; and the will even taking the pains to provide that on failure of the wife to take the bequest it should revert to and become a part of the testator's estate which was devised to trustees to hold for the purposes of the will.    It was not necessary, as in the case instanced above in the rule

as to the acceleration of remainders, that the failure to take the bequest should be held the equivalent of the wife's death, and distribution be made upon such failure to take as upon the wife's death, in order to carry out the intention of the testator that the devisees should have the whole estate, and to prevent the subject of the bequest from going as intestate estate to some one else whom the testator did not intend during the lifetime of the wife. Here we do not find, as in that case, the intention to be that if the wife did not accept the testamentary provision offered to her, the distribution should be made upon the death of the last surviving daughter without issue, or that that would be carrying out the intention; but we find the intention to be that the time of distribution should be the wife's death, whether she did or did not take the offered provision of the will. This case is without the reason of the rule as to the acceleration of remainders, and, as we conceive, that rule has no applicability here, under the peculiar provisions of this will; that to so apply it would be wresting it from its proper purpose of being in furtherance of the intention of the testator, to the thwarting of such intention.

In regard to the controlling effect of the intention in the application of the rule as to accelerating the remainder, see *Craven* v. *Brady,* 4 L. R. Eq. Cases, 209.

In *Hinckley* v. *House of Refuge et al.* 40 Md. 461, the testator gave property in trust for the use of his wife during her life, and from and after her death to certain charitable institutions named. The widow renounced all benefit under the will and made her election to take dower. She being still living, the charitable institutions made application to have their bequests paid at once, upon the theory that as the widow had renounced, the time of payment of the legacies to them had been thus accelerated, and that they were entitled to receive them presently, notwithstanding by the terms of the bequests they were payable only on the death of the widow. The court held that the property should be retained by the

trustee until the death of the widow, her death being the event upon which the legacies, according to the terms of the will, were payable. The general rule as to the acceleration of remainders was acknowledged, but that it should not be applied where the result produced would contravene the intention of the testator.

In *Firth* v. *Denney*, 2 Allen, 468, the testator gave $9000 to his executors to invest and pay the income to his wife during her life, and after her death to pay the fund to certain legatees. The widow renounced the provisions made for her in the will. The court held that the fund of $9000 must be retained in the hands of the executors during the life of the widow, and on her decease be paid over to the legatees.

Upon the happening of the wife's death in the lifetime of the daughters, why should not the will have directed that the estate should then be distributed to the daughters? Upon their death, in such event of the wife's death, it would, by the will, have been distributed to the children, if any, of the daughters, and did not the testator hold his children in as high regard as unknown grand children, and why not the estate go then, on the wife's death, as well to children, as to grand children on the wife's and daughters' death? No reason is apparent, save the one, that the estate should be kept together, managed and improved by the trustees for a certain length of time, and that the body of the estate as it should then be, at the end of that time and not before, should go over to the ultimate devisees. The whole scheme of the will seems to be permeated with the idea of the holding and the management of the estate by the trustees for a certain length of time, which was measured by the duration of these three lives of the wife and the two daughters; that the body of the estate should be held in the hands of the trustees to be managed, improved and augmented by them under the directions given by the testator, for that length of time, at the end of which, and not before, with its accumulation as thus managed, it should be distributed.

We are favored with the elaborate and able opinion delivered by the learned judge of the circuit court who decided this case below, which we have read with interest and profit.

It is there said there can be no doubt that had Mrs. Newberry not renounced, but taken under the will, there could be no division or distribution now, "for two reasons: *First,* The will is clear and distinct upon this point. Three lives must terminate before distribution can be made. *Second,* In the nature of things, no division and distribution could be had so long as the widow's testamentary estate existed. She was to derive an income from the whole property, and the income was an incumbrance upon the whole property. She was also to have a homestead for life out of the testator's property." We are quite unable to perceive why these same reasons do not exist with full force under the widow's renunciation. The will is no more clear and distinct upon the point in the case of the one event, than in the other. There are no words of the will connecting the time of final distribution with the so-called testamentary estate, any more than with the statutory one; nor, in fact, with either of them at all.

As respects the second reason, there now remains the same impediment in the way of division and distribution, to-wit: The outstanding life interest of the widow. Had she accepted the will, it would have been her homestead and annuity. Now that she has renounced the will, it is the incumbrance of her dower estate. It appears that a large portion of this estate is realty,—defendants' counsel say, three-fourths.

The case shows that the widow's dower has been assigned in the lands in Illinois, but not in the lands in Wisconsin. The widow, then, has now a life estate in one-third of all the realty, showing there to be the same impediment of a life interest in the widow, to the final distribution now, that there would have been had she accepted the homestead and annuity. The annuity was not, by the terms of the will, made any charge upon the estate. A portion of the realty,

it is true, has been disincumbered of the dower estate; but there was to be no piecemeal distribution of the estate; there was to be but one, a final, complete division and distribution of the entire estate at once. This is clearly manifested by the will.

What is called here the testamentary estate, was but an offer of a testamentary provision in lieu of the statutory estate of the widow, which was never accepted. A provision by will in lieu of dower is, in fact and in legal effect, a mere offer by the testator to purchase out the dower interest for the benefit of his estate. 2 Scribner on Dower, 496; 2 Williams on Exrs. ed. 1877, 1364; *Isenhart* v. *Brown*, 1 Edw. Ch. 413; and in the present case it was such in express terms. This offered substitute for the statutory estate might or might not be accepted by the widow, as the testator knew and foresaw. Both contingencies then, the one that the widow might retain her statutory estate, and the one that she might accept the proposed substitutional testamentary estate, were actually present before the mind of the testator, and in equal view of both of the contingencies he made the directions of the will appointing the time of distribution, and those directions must govern, and must, we think, have been intended to govern equally in either one of the contingencies.

We do not see how the rule of acceleration can be made to apply here, so that the time appointed by the will for the distribution, namely, the death of Mrs. Newberry, can be accelerated to the time of the death of the daughter, Julia Newberry. The principle of that rule is, that a remainder is accelerated whenever it is apparent that the only object of postponing the remainder-man was that the property might be enjoyed by the tenant for life. The facts of the present case preclude the idea that the postponement of the time of distribution was simply and only because of this offered testamentary provision as a substitute for the dower estate of the widow. There is no more room to say it was for such cause, than that the postponement was because, and on the account of such

dower. estate, which yet subsists, and will until the death of Mrs. Newberry.

We fail to perceive any failure here of the precedent estate upon which the ultimate remainder was limited.

If the time of distribution is to be considered as dependent on a life estate, it must be regarded as only contingently so on this particular testamentary substitute—in case of its acceptance—and that if not accepted, it was dependent on the dower estate. That it is to be viewed as fixed with reference to whichever estate should ultimately be and remain the estate of the widow, according as she should accept or renounce the provision under the will. A life interest, the dower estate, yet remains in the widow.

There is, too, the trust estate. The intermediate estate is not gone and out of the way. We deem this view sufficient, without noticing other objections which have been urged against the applicability here of the rule of acceleration.

The testator might very well prefer, whatever the motive, that his estate should be kept together during the life of the members of his immediate family, and he has most distinctly shown by his words that to have been his purpose, and directed explicitly that the property should not be divided and distributed until after the termination of their three lives. If we were to seek for the object of the testator in postponing the distribution when both daughters had died without issue, until after the decease of his wife, it can not well be found to be because it was thought necessary that the whole of this large estate should be kept to support a trust to pay an annuity of ten thousand dollars to the wife, and especially when it was uncertain whether the annuity would be accepted. But a small portion of the estate would be needed to produce that annuity, and it might have been provided for as was done by the court in *Sears* v. *Hardy,* 120 Mass. 524, by setting aside a part, say $200,000, of the personalty of the estate, invested in such securities as are directed by the will. Then the rest of the estate would be disengaged. And this, too,

serves to show that this annuity would have been at least no more of an incumbrance, in point of extent, upon the estate, than the dower interest,—the annuity, as remarked, not having been made any express charge upon the estate by the terms of the will.

Upon the assumption that the period of distribution is, in true meaning, appointed, not upon the death of the widow, but upon the termination of her life interest in the testator's estate, it must have been in order that the complete division and distribution contemplated by the testator might be made, and not because of the necessity of this whole estate to support the annuity of $10,000 to the widow. It was an integral, complete disposition of his entire estate he desired to make, which could not be made before the falling in of the reversionary estate; and it must be taken that the reversionary estate, however arising, was the reason of the postponement, rather than the expected acceptance of the offered testamentary estate, when the uncertainty of its acceptance was in the actual and expressed contemplation of the testator.

Until the death of the dowress, the reversion expectant in the dower lands will not be subject to the distribution.

It is, we regard, the plain purpose of the will, that the division and distribution should not be made until after the termination of the three lives; only at a time after the whole estate should have fallen into the trustees disencumbered of all further uses for the two daughters or the widow.

We can come but to the one conclusion, that the period of distribution appointed by the will has not yet arrived, and will not, until the death of Mrs. Newberry. To determine otherwise would seem to us to be, in this particular, making a will for the testator, instead of expounding the one which he himself made.

The decree must be reversed, and the cause remanded for further proceedings in conformity with this opinion.

*Decree reversed.*

Mr. JUSTICE DICKEY, dissenting:

The decision in this case seems to me to do violence to the intention of the testator, distinctly stated by the words of the will, when taken in their true and legal meaning.

I have examined with care at least one hundred cases referred to in the briefs of counsel, and I find no case,—where the will disposes of the whole estate, clearly cutting off the inheritance and provides for a succession of estates, the prior of which is a life estate,—in which the words, "after the decease" of the prior donee, have been construed to postpone the beginning of the ulterior estate until the physical death of the prior donee, after the termination of the prior estate,—where the effect of such construction is to leave the property constituting the subject of the gift, in idleness during the interval, in the hands of trustees having no beneficial interest therein, and to the present use of no one. It is believed no such case can be found in England or America.

I concur in the decision in so far as it holds that in this will the words of survivorship (as to the descendants of the brothers and sister) are to be referred to the period of final distribution under the will. I also concur in the view that, "if the time for distribution has in fact arrived, the claim, that the devise is still contingent, is without force, because the donees are ascertained in such case by the arrival of the time of distribution." And so I agree that the *prime* enquiry in this case is, "What is the time of distribution under the will? Has the period for distribution arrived?"

On that prime question my views are not in accord with those expressed by my brother SHELDON, in behalf of the majority of the court. I think the time has in fact arrived; and the decree of the circuit court ordering immediate distribution was right and that it ought to be affirmed.

The only words of the will in the case at bar, which, in my judgment, relate in anywise to the disposition of the residuary estate in controversy, are the following:

5—99 ILL.

The testator devises and bequeaths unto trustees (named in the will) " the residue and remainder of all my estate, real and personal, * * * *in trust* for the purposes hereinafter *fully set forth."*

" It is my will and desire to make provisions for my beloved wife, Julia Butler Newberry, * * * and I do hereby direct that my trustees pay to her for her support during her natural life the sum of $8000 annually." * * *
" None of the foregoing provisions for the benefit of my wife shall be operative, * * * unless she shall, within twelve months after my decease, relinquish all right, title or demand which she may have, or be entitled to by law by way of dower or otherwise, to my estate, or any part or portion thereof."

" It is my will, and I hereby direct, that * * * my said trustees shall divide the net income annually arising from the residue and remainder of my estate * * * equally between my said daughters, Mary L. Newberry and Julia R. Newberry, to be theirs absolutely. * * * If from any cause the net income of my estate shall, at any time, be inadequate to the support of my daughters, and there shall not be in the hands of my trustees, from such net income, sufficient to enable them to pay over, yearly and every year, to each of my said daughters at least the sum of $2500, then, in such case, I direct that my trustees take from the principal of my estate so much as will make up with the net income a sum sufficient to enable them to appor- tion to each of my said daughters $2500, and to pay the same to them respectively * * * as hereinbefore pro- vided." * * *

"In case of the death of either of my said daughters, having no lawful issue living, I will and devise that the portion of the net income which would have belonged to such daughter (as hereinbefore provided) had she survived, shall, from and after her decease, belong to and be paid over by my said trus- tees to my other daughter, if she survive, but if she, too, has

then deceased, leaving lawful issue, then such portion shall belong to and be paid over to such lawful issue until the final distribution of my estate, as hereinafter provided."

"And it is my will, and I direct, that in case of each and every bequest, and of every instance in which I have directed my trustees to pay over money to any person whomsoever, if the person or persons to whom or for whose benefit I have made such bequest, or directed any money to be paid, as aforesaid, shall have deceased, or for any cause be incapable of taking, then the amount so bequeathed, or so directed to be paid over, shall revert to and become a part of my estate, unless I have otherwise specifically directed."

"In case of the death of both or either of my daughters during the lifetime of my wife, leaving lawful issue living, it is my will, and I direct, that such lawful issue shall have and receive from my said trustees the portion of the net income from my estate which would have belonged to that one of my daughters from whom they are descended, had she survived."    *    *    *

"It is my will, and I direct, that after the decease of my wife, and after the decease of both of my daughters,    *    *    *  then as soon after the decease of my said wife and both of my said daughters, as the same can conveniently be done, my said trustees shall divide amongst, distribute and pay to the lawful issue of my said daughters the whole of my estate then remaining in the hands of my said trustees."

"In case of the death of both my said daughters without leaving lawful issue, then immediately after the death of my wife, if she survive my said daughters, but if not, then immediately after the decease of the last surviving of my said daughters, my said trustees shall divide my estate into two equal shares    *    *    *  and shall at once proceed to distribute one of said shares among the lawful surviving descendants of my brothers and sister ;    *    *    *  the other share of my estate shall be applied by my said trustees,

as soon as the same can consistently be done, to the founding of a free public library."   *   *   *

By a codicil, the annuity for his wife is fixed at $10,000 instead of $8000.

The testator died Nov. 6, 1868, leaving a widow and the two daughters, Mary and Julia, mentioned in the will. The widow renounced the provisions of the will and took her dower and a share of the personal property under the statute.

The daughters died without issue, Mary in February, 1874, and Julia April 4th, 1876. The trustees have paid all the legacies, and the widow is still living.

To ascertain the true meaning and intention of this will, let us examine some of the axioms of the law, and notice some of the views and rules which have been recognized and universally observed in like cases.

Where the absolute owner of property in perpetuity carves out of this perpetual estate several estates, fixing the time when each estate is to begin, and when it shall end, if the time named for the end of one such estate is also the time named for the beginning of the next estate, they are called successive estates, and the result of such plan of disposition is called a succession of estates.

In such case where the time named for the ending of one estate and the beginning of the next, is provided to occur upon the happening of a contingency, such contingency is called a limitation, because it is the boundary between the first estate and the second estate.

In such case, where the contingency in question relates to the first taker alone, and not to the second taker, or any other person, such contingency constitutes *only* a limitation or boundary between the estates, and does not constitute a *qualification* as to the second taker; and the words designating such a contingency are regarded as words of *mere* boundary, and are not words of *qualification* as to the second taker; for that contingency, not relating to the second taker, does not

constitute a qualification of the second taker, and is not a thing essential to his capacity to take.

Words describing a contingency on which one estate is to cease and another begin, are not to be understood as a qualification essential to the capacity of the second taker to take, unless that contingency relates to the second taker personally, or at least to some person other than the first taker.

The fallacy of the reasoning of counsel for appellants (it seems to me) consists, in the main, in a failure to distinguish the words of this will, (which are used as words of mere limitation—as boundaries—between the successive estates provided for,) from words of the will used as words of qualification as to the ulterior takers. Throughout their argument they constantly assume, without discussion or authority, that certain words of the will are in fact used as words of *qualification* of the next takers—when the words on which they rely are in truth used in the will as words *of mere boundary* between the *successive* estates,—as words *of mere limitation.*

The words of this will referring to the decease of the wife and to the decease of the daughters, respectively, are used, (as I think,) as words of mere boundary between successive estates,—and the only words of qualification, bearing upon this case, are the words referring to the survivorship of the descendants of the brothers and sister, and requiring that, to enable them to take, they shall survive the three estates for life mentioned in the will.

Counsel do not question what is said in Shepard's Touchstone, 435, note k, that "if a prior estate fails, either from incapacity of the prior devisee to take, or from the devise having lapsed, or *otherwise,* the remainder takes effect as if there had been no such prior devise ;" nor do they question what is said in Theobold (on Construction of Wills, 450,) that "when there is a gift to A for life, and after his death to B, if A is incapable of taking, or if he refuse to take, the remainder is accelerated ;" nor do they seem to question the ground of this doctrine to be, as stated by Jarman, "that although the ulterior devise

is in *terms* not to take effect in possession until the *decease* of the *prior devisee,* if tenant for life, yet in *point of fact it is to be read as a limitation* of the remainder, to take effect in *every event* which removes the prior estate out of the way." Jarman on Wills, (3d ed.) 539.

But they seem to fail to take note of that part of Jarman's words saying that "it is to be read as a *limitation.*" They do not observe that the *decease* mentioned as the contingency on which the prior estate is to end, and on which the ulterior estate is to begin, is a contingency having relation to the prior devisee only, and having no relation to the *ulterior* devisee, and therefore the words "after the decease" are to be held words of mere boundary,—or, in the language of Jarman, words used "as a limitation," and are not words of qualification, essential to the capacity of the ulterior devisee to take. His capacity to take not being affected by such words, he takes the moment the boundary is passed, which is designated by the words "the decease" of the prior devisee; which mean the end of the prior estate.

That this is the true meaning of such words, when used in a will which clearly cuts off the heirs by a residuary clause, or other equivalent clauses (unless controlled by other provisions of the will, or by considerations other than the words "after the decease,") is established by an unbroken line of authority from the earliest days; and no court in England or America has ever held otherwise so far as I can learn.

The briefs and arguments in this case are able and comprehensive, and the research so exhaustive that I feel safe in assuming that if any such case could have been found, it would have been produced for our consideration.

In *Jull* v. *Jacobs,* 18 Moak's R. 775, the devise was to a daughter of the testator "during her lifetime," and "after her decease" to be divided equally between "her children on their becoming of age." The daughter signed the will as a witness, and for that cause, under the English statute, the devise to such daughter was void. The question was as to

the disposition of the property devised, during the period between the death of the testator and the actual death of the daughter.

The vice chancellor said: "Where property is *limited* to A for life, and after his decease to A's children, if A forfeit the life estate, his children have a right *immediately*, because 'from and after the decease' means from and after the determination of the life estate, and however it ·is, terminated, whether by death or forfeiture, it is gone;   *   *   *   that would be the conclusion I should come to from the reason of the thing, without the decisions.   But the decisions are all the same way."

He quotes from *Lainson* v. *Lainson,* 18 Beav. 1, with approval, the words of Lord ROMILLY,where he says: "Although the expression used is that the estate of the son is only to take effect 'from and after the decease' of John Lainson, I am of opinion that the meaning is from and after the determination of his estate, by death or *otherwise.*   In deciding this, I fulfill the intention of the testator."   *   *   *   And he adds:   "This doctrine rests upon the authorities from the earliest period downwards."

So in *Young* v. *Robinson,* 8 Jur. N. S. 825, it is said by Lord CRAMWORTH to be "a rule well established by all the authorities, as well as upon principle, that *prima facie,* survivorship means the time at which the enjoyment by the survivor begins;   *   *   *   if there be a previous life estate, then 'at the termination of that life estate;'" (and, on the foregoing authorities, we may add) whether by the death of the life tenant or otherwise.

So in *Fox* v. *Rummery,* 68 Maine, 121, the gift in question was to the wife of the testator "during her natural life," and "after her decease" to a trustee for the use of an adopted son named, "if he should *survive* her."   The widow renounced the benefits of the will.   The heirs of the testator claimed the income of that part of the estate until the actual death of the widow.   The court said:   "All the wife's interest in it is

at an end as much as if she were dead. The rule is, that the extinction of the first interest carved out of the estate accelerates the right of the second taker," and held that the right of the adopted son to that part of the estate begun at once—although, in terms, he was not to take unless he survived the widow. He survived the life estate provided for her in the will, and "after her decease" meant after the determination of her life estate. Here it will be observed the words, " after her decease," having relation only to a contingency to happen to the prior donee, was held not a qualification as to the ulterior donee, and although to survive her was made a qualification of the ulterior donee, (being a contingency to happen to him,) still, surviving her, was held to mean, surviving her life estate, because the end of her life was a mere limitation, or boundary of the first estate, meaning the end of her estate.

So in *Macnitt's Exr.* v. *Macnitt et al.* 24 N. J. 227, the testator gave to his wife the income of certain property for life, or so long as she remained unmarried, and "after her decease or marriage" to go to an infant daughter. The widow refused the provision of the will. The court held the .gift vested in the infant daughter immediately upon the renunciation of the widow—though she had neither died nor married—and this because the contingencies of death or marriage, having relation to the prior donee, were each a mere limitation or boundary between the estates, which by the will were to be successive, and hence were not essential qualifications to enable the ulterior donee to take.

The distinction between contingencies marking the boundaries of estates which are mentioned in wills as mere limitations and contingencies which are to be regarded as qualifications, without which no donee can take, is noticed in *Merry* v. *Hill*, 8 L. R. Eq. Cases 622. There, the residue of an estate was given to trustees to sell and convert and pay the income thereof to Mary Ann Merry for life, and after her decease to pay and divide the same among all and every such

child or children of her, as should survive her and who should attain the age of 21 years, with a provision for paying £100 per annum for each child towards its support and education, and during the " suspense of absolute vesting to accumulate the residue, if any." The question was whether those children who survived the life estate took vested interests at the end of that estate, although they had not attained the required age, and it was held they did not; that to survive that estate " is not to be the sole *qualification* of their taking," but they must also attain 21 years of age, " because that is described as the *qualification* by which they are to take, and no child can take who does not attain that *qualification.*"

And after some further discussion, it is said the words (when they attain the age of 21) show " that their attainment of the age of 21 years is to be a *qualification* for their taking."

The life tenant in that case was actually dead, and survivorship at her death was also a necessary qualification of an ulterior taker; but had her estate been terminated by any cause other than death, that qualification would by all the authorities have been held to be survivorship at the termination of the life estate in question. And all this upon the principle that the words " after her death," relating to a contingency applicable only to the holder of the prior estate, are words of mere boundary or limitation; while the words " who survive," relating to the second taker, are therefore words of qualification, meaning those who survive the termination of the life estate; and the words relating to the age of the ulterior taker are words of absolute qualification, and not words of *mere* boundary.

In the case at bar the death of each of the holders of prior interests under this will (in every part of it where such mention is made) is mentioned as the contingency upon which the estate of that holder is to cease, and also as the contingency upon which the estate (*quo ad hoc*) of the ulterior

donee shall begin, and is introduced into this will as a *limitation* only, and not as a qualification of the next taker; being a contingency in each instance, having relation only to the prior donee and having no relation to the subsequent donee. To be a survivor at the termination of the prior estate is, however, a necessary qualification in this will of each of the ulterior donees, but a qualification which by this record each of the appellees possesses.

The following cases were decided upon the same principles: *Eavestoff* v. *Austin*, 19 Beav. 591, where a prior life estate was removed by a revocation thereof in a codicil; this was held to answer the words "after the decease" of the prior donee, and the ulterior donees were let in at once, although the prior donee was still living.

So in *Yeaton* v. *Roberts*, 28 N. H. 459, where the prior donee refused the gift, and this was held to fulfill the words fixing the decease of the prior donee as the time when the ulterior donees should take, and the ulterior donees were let in at once, while the prior donee was still living.

So in *Adams* v. *Gillespie*, 2 Jones' Eq. 244 N. Car. R., where the renunciation of the gift by the prior donee was held to fulfill the words fixing the death of the prior donee as the time when the ulterior donee should take.

So in *Holliday* v. *Walker*, 3 Jones' Eq. 36, in which it was said "the same result which would have been arrived at by the death" (of the prior donee, had she taken under the will), "must in our opinion be brought about by her dissent" or refusal to take under the will.

So in *Waddell* v. *Terry*, 4 Cold. 51, where the renunciation of the gift by the prior donee named, was held to let in the ulterior donees at once, although the latter in terms were to take only after the death of prior donees.

And so in *Craven* v. *Brady*, (L. R. 4 Eq. 209,) where the life estate, devised to a wife, was terminated by forfeiture, and where, by the terms of the will, the son was to take a life estate to begin "immediately after her decease," it was held

that the son took upon the termination of the wife's estate by forfeiture, and this while the wife was still alive. In this case Lord ROMILLY uses the following words, (page 215): "If the testator has expressed an intention that if the appointment for his wife for life should cease by reason of forfeiture, in that event the appointment in favor of the son should take effect at once, then the son's estate is accelerated, and I think this testator has expressed such an intention, and that this is *made clear* by the words to which I have already referred, whereby he makes the appointment to his son of these lands immediately on the decease of his wife; and, secondly, he directs that the forfeiture which may take place shall determine her estate as effectually as by her actual decease. I think the two taken together make a *clear expression of intention* that the appointment in favor of the son is to take place *as soon as that* in favor of the widow *fails,* and consequently the estate of the son is to be accelerated."

Now, apply this language to the case at bar, and, following Lord ROMILLY, say: "If the testator has expressed an intention" (in case of the death of his two daughters without issue) "that if the provision made for his wife for life should cease by reason of" her renunciation, "in that event the" provisions in favor of his nephews and nieces "should take effect at once, then" the estate of the nephews and nieces "is accelerated, and I think this testator has expressed such an intention, and this is made clear by the words to which I have already referred, whereby he makes the" provision for his nephews and nieces to take effect "immediately on the decease of his wife; and, secondly, he directs that the forfeiture, which may take place, shall *determine her estate* as effectually as by her decease. I think the two taken together make a *clear expression* of intention that the" provision in favor of the nephews and nieces "is to take place *as soon* as that in favor of the widow fails, and, consequently, the estate of the" nephews and nieces "is to be accelerated."

This very case of *Craven* v. *Brady* is referred to as against the conclusion of the circuit court in this case, as is said "in regard to the controlling effect of *the intention* in the application of the rule as to accelerating the remainder," and this, as I suppose, because it says distinctly that the intention must control. Of course the intention must control; but the question in this case (as in every case in the construction of a will) is, what *is* the intention. This case makes plain the path to follow in seeking the intention, and holds that the words providing for a forfeiture of the rights of the wife under the will taken together with the words giving an estate to the nephews and nieces (under the facts of this case) "immediately after the decease" of the wife "make a *clear expression* of intention that the gift to them" is to take place as soon as that in favor of the widow fails, "and that their estate is to be accelerated."

So by the rule in Jarman these words, "after the decease" of the life tenant, are *to be read,* "after the end of the life estate," in such cases; and if so read the words of this will make a *clear expression* of an *intention* that, when the wife's life estate ends, the ulterior estate begins.

Guided by these authorities and these reasons, let us seek the true intention of the testator from the true and legal meaning of his words.

Let it be noted that by the words of the will we are expressly forbidden to indulge in any conjecture as to the *purposes* of this trust; for the testator has most distinctly declared in the granting clause, to his trustees, that *the* purposes of the trust are "*fully set forth*" in the will itself. Another palpable feature of the will is that the inheritance is most explicitly cut off,—so there is no ground for the suggestion of partial intestacy. It must not be forgotten that the appellees are the *residuary* legatees of the one-half of the estate which they claim. It is also obvious from the reading of the will that the testator understood that bequests and devises might fail from causes other than the death of

the donee, for he says, "if the person or persons (to whom I have made any bequest or directed any money to be paid) shall have deceased, or for *any cause* be incapable of taking," etc.

It is equally obvious that his intention, as to the body of his estate, was to create a succession of estates,—one to follow the other consecutively and closely; the will on its face provides strictly for just such a succession of estates.

Every one of these estates, by the words of the will, is to begin at the same time that its predecessor ends.

Keeping in mind, then, the rules, that "if a prior estate fails for any cause, the remainder takes effect as if there had been no such prior devise," and that in case of a "gift to A for life, and after his death to B, if A refuses to take, the remainder is accelerated;" and keeping in view the idea "that although the ulterior devise is in *terms* not to take effect in possession until the *decease* of the prior devisee (if tenant for life), yet it is to be read *as* a *limitation* of the remainder, to take effect in every event which removes the prior estate out of the way," and that this is because "from and after the decease" means "from and after the determination of the life estate;" and remembering that "this doctrine rests upon the authorities from the earliest period downwards;" and also that in seeking the intention of the testator, we must inquire "what does that mean which he has written," and remembering a rule to which that is said to be subordinate (in *Brown* v. *Lyon*, 6 N. Y. 420,) and which is, that "where words and phrases have received a fixed legal interpretation by repeated decisions, such words and phrases, when employed by the testator in his will, *are to receive* such legal and fixed interpretation as a long series of decisions has attached to them," we can not find much difficulty in giving a true interpretation to what is said in this will.

It seems to me it is to be read, in so far as it applies to the facts which have actually happened, as follows: "It is my desire to make provision for my wife, and I direct my trus-

tees to pay to her, during her natural life, the sum of $10,000 annually, and that they divide the net income annually arising from the residue of my estate, equally between my two daughters."

" In case of the termination of the life estate herein given to either of my daughters—in the absence of issue by that daughter, that portion of the net income which would have gone to her if her estate had continued, shall belong to my other daughter."

" In case of the termination of both the *estates* for life, respectively given herein to my daughters, then if the estate (for her life herein given to my wife,) shall have terminated— my trustees shall divide my estate into two equal shares and distribute," etc.

Thus the law declares this will is to be read. These are the *express* provisions of the words of this will. They are not to be disregarded in this their true meaning, unless other words of the will forbid this reading.

If this be the true version of this will, it follows, that by the renunciation of the widow, that part of the income given to her was *at that time* accelerated and given to the daughters.

It was *here* where the *acceleration* took place in fact. As is aptly quoted with approval by counsel for appellants, from standard authorities, " A gift of the produce of a fund for life is a gift of the fund itself for life."

After the renunciation of the widow, each of the daughters was entitled to one-half of the net income from the whole body of the estate for her natural life, and had therefore an estate for life in one-half of the body of the estate.

This was the result of the acceleration caused by the termination of the life estate offered to the wife, and if the trustees did their duty they paid to the daughters, from and after the renunciation, the whole of the net income of the body of the estate so long as they both lived, (and although this record is silent on that matter, I doubt not they did so.) When Mary died, February, 1874, by the terms of the will

Julia took the whole of the body of the estate for her natural life, and was, during her life, entitled to receive from the trustees the income from the whole estate.

It follows, that on April 4, 1876, when Julia Newberry died, the whole estate was ready for distribution. The prior estates were all out of the way, and it became the duty of the trustees to divide and distribute to the residuary devisees.

The words "immediately after the death of my wife, if she survive my daughters," are plainly words of mere limitation or boundary, and are not words of qualification as to the ulterior takers of the estate. They plainly have reference to the *succession* of *estates,* mapped out so distinctly in this will. By sound reason, as well as by authority, they simply mean, after the termination of the life estate of my wife, if that shall continue after the end of both the estates for life given to my daughters.

This rule of construction has no exception whatever in the text books, or in the English cases, even as against the heirs, in whose behalf it is sometimes claimed in such case that the use of the estate, for the time between the end of the prior life estate and the actual death of the person named as tenant for life, is not disposed of by the will, and should therefore go to the heir. This, too, is the rule in American cases.

This rule is universal in every court which has passed upon the question in England and America as applied to cases where the inheritance is expressly cut off, as in the case at bar, by a residuary clause or its equivalent. Even as against the *heir*, where the inheritance is not expressly cut off, the rule has prevailed, so as to exclude the inference of partial intestacy, in all courts, so far as I can learn, except in one case,—that of *Augustus* v. *Seabolt*, of which I will speak hereafter: remarking here only, that by the teaching of that case, the time for final distribution of this estate has come.

The rule under discussion applies only to successive estates, and does not always apply to *specific legacies* made payable at the death of a life tenant. Two cases illustrating this

remark are relied upon to support the claim of the trustees in this case. These cases are *Firth* v. *Denny*, 2 Allen, 468, and *Hinckley* v. *The House of Refuge et al.* 40 Md. 469. These cases relate to specific legacies, and not to strictly successive estates, and are therefore not in point in this case. I will refer to the Maryland case hereafter.

In the case of *Firth* v. *Denny*, 2 Allen, 468, the testator directed his trustees to invest the sum of $9000 and pay "the net income thereof to his wife during her life," and after her death he gave one-half of this fund to three persons (who by another part of the will were made his residuary legatees,) and the other half of this fund he gave to various legatees in specified sums to each. The widow waived the provisions of the will. The trustees, under the statute of that State, asked directions from the court as to the disposition of this fund. The residuary legatees claimed the whole fund of $9000, and that the special bequests were defeated, and if not entitled to that, they insisted that the legacies of the one-half of the fund were not payable at any rate until the wife's death.

Counsel for the donees of these latter legacies insisted that the waiver of the widow did not defeat these legacies, and that "if they are entitled to receive their legacies, but not until the death of the widow, the court may order a proper sum to be set aside for the purpose, or order the sum paid now with a deduction." The points and authorities of counsel are given in the report. No one of the authorities which I have mentioned was cited; nor was the principle of these authorities adverted to; and this, no doubt, because it was not strictly a case of a succession of estates; nor does it appear that the special legatees claimed a right to *immediate* payments. The court directed that the $9000 must remain in the hands of the trustees until the death of the widow, and on her death one-half should be applied to the special legacies and the other half to the residuary legatees, and that

in the meantime the *entire income* of the whole fund should be paid, from time to time, to *the residuary* legatees.

It will be seen at once that if this case be followed as authority it would keep the body of this estate in the *custody* of the trustees until the death of Mrs. Newberry, but it would give to the complainants one-half of the income during the interval, with which they would no doubt be content. I do not regard this case as a matter of any moment on *this* question. The controversy in the case was on another question. It was insisted by the residuary legatees that the main purpose of raising the $9000 fund having failed by the renunciation of the widow, the whole gift to the trustees of that fund lapsed and fell into the residue for the residuary legatees. This position the court refused to sustain. The authorities cited in the case all relate to that question, and there seems to have been no claim for immediate payment in behalf of the special legatees of half that fund.

As before remarked, even this case would give one-half the income to these complainants as residuary legatees.

The case to which I refer as exceptional, and on which counsel for appellant seem to rely, is that of *Augustus* v. *Seabolt,*. 3 Met. 155, wherein the Court of Appeals of Kentucky is supposed to have disregarded the line of cases above; but, on a careful examination of that case, though it differs from the current of the cases quoted by me, it is found to be in harmony with my conclusions.

In Jarman on Wills, and in *Jull* v. *Jacobs,* and in *Lainson* v. *Lainson,* the words "after the decease" of the life tenant are held to mean "after the termination of the life estate," as a rule even as against the *heir,* in cases where there is *no residuary* clause in the will.

In *Augustus* v. *Seabolt* it is conceded that this is the rule in all cases where there *is* a residuary clause, or where the will is such as to *cut off* in every respect *the inheritance* ; but the Court of Appeals held, that in cases where the will contains *no* residuary clause or other equivalent provisions *cutting off*

6—99 ILL.

the heir expressly, the rule of construction is otherwise. The rule as laid down in Kentucky sustains the appellees in the case at bar, for no one can question that this will *cuts off* effectually the inheritance.

In that case the testator devised to his wife, among other things, his farm "during her natural life," with a proviso that "in case she shall marry she is only to hold that part of the farm which lies eastwardly from the lane," and also provided that "after her death the farm should be divided equally between the surviving children" of certain named brothers of the testator. The widow married, and while she still lived, the heirs at law of the testator claimed the use of that part of the farm not lying eastwardly from the lane, during the period from the marriage of the widow until her death. The executors proposed to pay the income for that period to the then surviving children of the brothers named in the will. The will contained *no residuary* clause.

The chancellor refused the claim of the heirs, founding his judgment upon the idea that the testator intended to dispose of his entire estate by his will, and that such intention is to be gathered from the terms of the will.

The Court of Appeals say of this decision of the chancellor, " if *this view* be *correct, no doubt can* be entertained of the *propriety* of his judgment." That court, after discussing the various clauses of the will, and differing from the chancellor as to whether by the terms of the will the inheritance was cut off, further say : "Now in the *absence of any residuary clause* in the will, it can not be said that provision was made for the contingent interest in the land west of the lane, which would exist upon the marriage of the widow and continue until her death," and so the judgment of the chancellor was reversed.

It will be observed that in that case the question arose between the heirs and the ultimate devisees, and not between the ultimate devisees and trustees holding the naked title without any beneficial interest in the estate.

The chancellor and the Court of Appeals agree in the proposition, that in a will containing a residuary clause, or any clause or clauses by which the inheritance is cut off, the words "after the death" must be construed to mean, after the termination of the prior estate of a life tenant, whether by death, marriage or any other cause. They do not seem to hold (as is taught by authorities supra) that such should be the construction *without* a residuary clause or its equivalent. It is sufficient for the present case, that, according to the views of both the chancellor and of the Court of Appeals in this Kentucky case, the time for final distribution to the ultimate donees has arrived in the case at bar. If the will of Mr. Newberry did not contain the clause calling in as a part of the body of his estate every bequest and direction to pay money where the donee is incapable of taking, and did not contain any other clauses cutting off the inheritance, the case of *Augustus* v. *Seabolt* might be an authority against immediate distribution, but, with these provisions in the will, that case is an authority in point in favor of immediate distribution and directly in favor of the next takers under the will. I say it *might* be against immediate distribution in such case; but even that is not clear, for that will differs from this in an important feature. By this will a close succession of estates is provided for on the face of the will. In that case on the face of the will the succession of estates was not perfect. By the terms of that will the estate of the wife, had an alternative limitation, death or marriage, but the limitation at which the estate of the ulterior donees was to begin, was, by the terms of the will, to depend upon only one of these contingencies. It may be that the Court of Appeals of Kentucky for that reason did not regard the case one of a succession of estates, on the face of the will. In the case at bar the succession of estates on the face of the will is close and clearly defined. The declaration of the Court of Appeals is, therefore, stronger for this doctrine of acceleration than is necessary for my views in this case. In

neither this case nor in the *Firth* v. *Denny* case was the controversy with trustees having no beneficial interest.

In the Kentucky case, as shown, the use went to the *heir* instead of the ulterior donee, upon the ground that there was partial intestacy; and in the case in Massachusetts, no mention was made of the question of acceleration,—the counsel for the ulterior donees merely saying, "if the defendants are entitled to receive their legacies, but not until the death of the widow, a proper sum may be set aside for them." The court gave the income meanwhile to the *residuary legatees*. In the case at bar the appellees are *residuary* legatees of half of this estate.

Among the numerous cases to which attention has been called in the case at bar, no case has been found in which such words have been held, of themselves, sufficient to postpone the ulterior donee where there is no express direction to hold until some other event, nor any express direction to hold for some other purpose, and where there is no other person to whom the use meanwhile can be given.

Counsel for appellants refer to the case of *Hinckley* v. *The House of Refuge et al.* 40 Md. R. 461. That case recognizes the rule here stated, but makes an exception to the rule upon equitable grounds peculiar and special to that case, for the purpose of preventing injury which, it is said, would otherwise be caused to the residuary legatees. The will in that case granted the residue of the estate to a trustee in trust to pay the income to his wife for life, and, at her death, to pay out of the principal certain legacies to certain charitable institutions, and then *to hold* the remaining part of the estate (so in his hands as such trustee) one-half for the use of all the children of testator's daughter, who might be living at the death of his wife, and the other half for the use of the children of testator's sister, who might be living at the decease of the wife; but in no event to be distributed to the children except as they should come to the age of majority.

The widow renounced the testamentary gifts, and took her dower and statutory allowance.

The charitable institutions claimed immediate payment of the legacies. This was resisted by the residuary legatees. The court held that inasmuch as the gifts to the residuary legatees were greatly reduced by the renunciation, they should be compensated for their loss out of the estate rejected by the widow, so far as it could be done without putting the charitable institutions in a position worse than that which they would have occupied had the widow accepted the gifts of the will, and on this ground directed the fund claimed by them to be put out at interest to accumulate a fund for the benefit of the residuary legatees until the death of the widow, and then the legacies were to be paid to the benevolent institutions, and the balance to be held for the use of the residuary legatees.

In that case the court refer to and approve the doctrine for which I contend, as before that time laid down by that court in the cases of *Darrington* v. *Rogers*, 1 Gill, 403, and *Clark* v. *Tenneson*, 33 Md. R. 85.

In the case now under consideration there are no such equitable considerations to be subserved by postponement; nor is there here, as there, a direction to the trustees "to hold and invest all the net income for *accumulation*" until the majority of the residuary legatees respectively. One of the purposes set forth in that will was to hold "for accumulation." No such purpose is set forth here.

A case much relied upon by counsel for appellants, is that of the *Estate of Matthew Delaney*, 49 Cal. 76. The testator devised the residue of his estate to his executors *in trust* to sell certain lands and invest the proceeds, and to pay out of the income, to his wife, a certain sum monthly, "during her natural life," and to divide the surplus, paying one-fourth to his wife and dividing three-fourths thereof between his *surviving* children, and, on the death of his wife, the balance of

any money or lands remaining to be divided equally among his *surviving* children. The testator died in December, 1865. The will was probated January 11, 1866. One only of the executors named accepted the trust. The widow renounced the benefits of the will July 16, 1866. The executor sold part of the real estate and conveyed the same by deeds to the purchasers, dated in 1867, 1869 and in 1870, and paid out the proceeds in the discharge of debts of the testator and expenses of administration. The testator left him surviving a widow and three children, Edward, Cecillia and Mary, who were also his only heirs at law. Edward was executor. On May 15, 1871, the executor, wishing to close the business of the estate, filed in the probate court *his petition* for *"final distribution,"* together with accounts of his receipts and disbursements. These were not questioned. Three days after the application for *final distribution* thus made by the executor, a cross-petition was filed, May 18, 1871, by the daughter (Mary) of the testator, (then Mrs. Mary McCurrie), in which she claimed, *also,* that "the estate was ready to be closed," and *asking distribution* among the three children, "according to their several rights."

The case was heard at the May term, 1872, of the probate court. At the hearing, it was claimed by Mrs. Mc-Currie, that by the renunciation of the widow the plan of the trust created by the will was defeated, "that the object for the creation of the trust was thereby terminated," and that an end was thus put to the power of the executor and trustee to make sale, under the will, of lands, and that the sales made were void, and hence she insisted that *all* the lands should be distributed equally among the three children *as heirs* at law, stating that the heirs at law had elected to take their shares without being reduced to cash.

The probate court held otherwise, and set apart the sold lands to the respective purchasers, but *divided* the lands *remaining* unsold *equally* among the three as *ultimate devisees.*

This decree Mrs. McCurrie brought before the Supreme Court of California for review. The decree of the probate court *was affirmed.*

Here it will be observed that, by the terms of the will, "the balance of the money and lands" was to be divided among the surviving children *only* "on the death" of his wife. But upon the principle, that in such case the words "on the death," mean on the termination of the life estate, the distribution was made upon the renunciation of the widow, although she was still living.

Counsel for appellants seem to have entirely misapprehended this case. Speaking in their brief of it, they *say,* "the court held that the renunciation did not extinguish the trusts declared in the will, which were not only to sell but to *hold* the proceeds invested until the death of the wife, and then distribute to surviving children." * * * "It" (the court) "confirmed the trust powers of the executors and their sales, *and refused the distribution.*"

It is true the court did hold that "the renunciation did not extinguish the trusts declared in the will," but the court did *not* hold that the trustees should "hold the proceeds invested until the death of the wife, and then distribute to surviving children." On the contrary, the court confirmed the decree of the probate court, by which the entire residue of the estate (after paying debts, legacies and expenses) was immediately distributed to the then surviving children, as ultimate donees under the will, and this while the widow was still living.

Again, the court *did* "confirm the trust powers of the executor and his sales," but the court *did not* "refuse the distribution." The report of the case does not set out the decree of the probate court, but on page 85 RHODES, J., who delivered the opinion of the court, speaking of this decree, calls it "the decree of *final distribution* from which this appeal is taken." This attracted my attention, and at my request I have been furnished an authenticated copy of

the record of the decree, which enables me to state the case accurately. The controversy in the case was not for or against immediate distribution. The trustee did not claim the right to hold until the death of the wife. The lawyers on both sides of that case, and both the probate and Supreme courts, all seem to have assumed the law on this subject to be as I insist it is, and so no question was raised against the acceleration of the estate of the ultimate donees, and it was taken for granted by all concerned that if the will stood, the widow's life estate under the will being out of the way by reason of the renunciation, the time for ultimate distribution under the will had come.

The case involved an entirely different question. In the report of the case, on page 78, is found a brief statement of the petition of Mrs. McCurrie, which states her claim to be "that by the renunciation of the widow * * * that portion of the estate *devised* to the *executors* in trust became subject to distribution *among the heirs* at law in the *same manner* as if the said Matthew Delaney had *died intestate.*" This claim embraced the lands sold by the executors, and the claim was that the deeds and sales were void, and that all the lands should be distributed to the heirs, not to them as devisees, but as heirs.

In the governing opinion in the case at bar (speaking of this California case) after stating the claim of Mrs. McCurrie that the lands be distributed among the heirs as intestate property, it is said the court denied this claim, and then the following is quoted from the opinion of the court in California:

"The renunciation of the widow * * * did not extinguish the trusts declared in the will nor divest the executor of the fee in the remaining portion of the property. The executor retained the same powers over the portion of the estate remaining * * * after the renunciation * * * that he possessed prior to the renunciation." Now, these words are found in the opinion in the Delaney case, but they relate *not* to the question of acceleration, but to the question

as to the validity of sales made by the executor of that part of the lands sold after the renunciation.

It was claimed the executor lost the power of sale by the renunciation, and it was in condemnation of that proposition these words were used by the Supreme Court of California.

It is not perceived that these words of that court have any bearing whatever upon any question involved in the case at bar. There is no claim in this case that the powers of the trustees appointed by Mr. Newberry have in any way ceased, or that they have in any degree lost their control over the estate. The claim here is that the trustees shall proceed in the exercise of their powers under the will—not that the trusts have failed or been defeated. They are asked to perform the duties imposed upon them by the *will* in the discharge of their trust.

This California case in its facts and in its decision is, however, a potent authority in support of the decree of the circuit court in this case. There, as here, the final distribution was ordered by the will to be made to *survivors* at the *decease* of the wife. There, as here, the wife was given a life estate. There, as here, she renounced the gift and asserted her legal rights. There, as here, the final distribution was ordered to be made at the termination of the life estate offered the wife, although she was still living. There, as here, the distribution was to those who survived the life estate offered the widow, although they had not survived her natural life. This decree was affirmed by the Supreme Court of California.

Counsel for appellants, however, quote *Festing* v. *Allen*, 12 M. & W. 279, *Rhodes* v. *Whitehead*, 2 DeGex & Sm. 532, *Carver* v. *Burgess*, 18 Beav. 541, *Lock* v. *Lamb*, 4 L. R. Eq. D. 372, *Newman* v. *Newman*, 10 Sim. 51, *Knight* v. *Knight*, 2 Sim. & Stu. 490, *Bull* v. *Pritchard*, 1 Russ. 213, *Botsford* v. *Hebbell*, 3 Ves. Jr. 363, *Duffield* v. *Duffield*, 3 Bl. N. R. 260, and perhaps other cases, to support the position that the time for distribution to the descendants of the brothers and sister of the testator is fixed by the terms of the will at the termi-

nation, not of any *estate*, but of the *life* of Mrs. Newberry. None of these cases give any support to that proposition.

In all and each of these cases the ulterior donees were to take only upon the attainment of a given age, and it was in each of them held, that no donee could take until the required age was attained. It will be observed, the contingency, thus held a necessary qualification to the taking of the ulterior donee, was in none of these cases named as the *boundary* at which the prior estate was to end, and that the contingency in question had no relation to the *former* donee, but had a personal application to the ulterior donee; and so upon the principle here presented, such contingency was not named as a *mere limitation* or boundary between estates which were to be closely consecutive, but was named in every one of these cases in the will as a *qualification* of the ulterior donee or donees. These cases are in no way analogous to the case at bar.

There is another class of cases to which we are referred, wherein marriage by the person or persons named as ultimate or ulterior donee or donees, or the alternative of marriage or the attainment of a given age by such ulterior donee, or to survive when some other person shall attain a given age, is made by the terms of the will a condition to the taking effect of the gift. These cases are equally irrelevant for the same reason.

Such is the case of *Leake* v. *Robinson*, 2 Mer. 263, and others.

In another class of cases survivorship by the ulterior donee at the decease of the prior donee, (a life tenant) is held an essential qualification of an ulterior donee, upon the ground that, by the terms of the will, the gift was only to such as survived the prior donee.

In every one of these cases the prior estate was not out of the way until the actual death of the prior donee,—as in *Hearn* v. *Baker*, 2 K. J. 386, *Knight* v. *Poole*, 32 B. 548, *Stevenson* v. *Gullan*, 18 B. 590, *Spurrell* v. *Spurrell*, 11

Hare, 54, *Hoghton* v. *Whitgrave,* 1 J. & W. 146, and *Vorley* v. *Richardson,* 8 D. M. & G. 126, and other cases quoted by counsel for appellants, and among these the case of *Drake* v. *Pell,* 3 Ed. Ch. 267. In all these cases the boundary between the prior estate and the following estate had not been reached by the death of the prior donee, or by any other cause.

But as said above, no case has been produced and it is believed no case can be found in England or America where by the will the inheritance is clearly cut off, in which the prior estate (being a life estate) is out of the way by any contingency, other than death, wherein the next taker under the will has been postponed until the actual death of the prior donee upon the ground merely that, by the terms of the will, he was only to take "after the decease" of the former donee.

The case of *Roe's Executors* v. *Roe,* 21 N. J. 253, is submitted as such a case, but it is not. In that case, by the will, the executors were directed to invest a certain sum in a well improved farm and to stock it and to hold the same in trust until the death or marriage of the testator's wife, or the arriving at 21 years of age by his youngest child, for the use of his wife and *his sister* during her widowhood, *and* also for the use of *five of his children* (named), as *a home* for his wife *and these five children.* He directed that if either of these children should marry, his or her right to enjoy the home should cease. The whole was to be divided equally among *all* of his children, when his wife should die and the youngest child be 21 years of age. The widow renounced the provisions of the will.

Thereupon certain children, named in the will as ultimate donees, and not of the five named as prior donees, claimed that by the renunciation of the widow the plan of the testator was defeated, and that the trust had failed and was therefore at an end, and that the whole estate should therefore be at once distributed among the ultimate donees under the will. The other children and the sister claimed that the rights of

the widow alone were affected by her refusal to take under the will.

The court held the gift to the prior donees was joint, and that by the renunciation the widow alone lost her interest; that the trust had not failed nor had it been accomplished; that the widow could not divest the interests of the *sister* or the *five children;* and directed a home and support to be provided for the five children, and the widow to live with them if she chose, furnishing *her own support.*

The residue of the estate was, by *the will,* expressly directed to be kept invested *for accumulation* till the youngest child became of age, and the court so ordered.

It will be seen at once that this case of Roe's estate bears no analogy to the case at bar and gives no support to the position of appellants. There, the purposes of the trust, in a great degree, remained to be accomplished. Here, accumulation is not set forth as one of the purposes, and the purposes are all at an end. There, five of the children and the sister of the testator still lived and had a right to the benefits of the estate in question until the youngest child should be of age. The prior estate was not out of the way.

So in *Plympton* v. *Plympton,* 6 Allen, 178, the trustees were to pay three-quarters of the income from the body of the estate to the testator's wife until her death or marriage, for the use of herself and her *two children* ;—the widow renounced.

The court held that the three-quarters of the income must all go to the children, and she, being their guardian, should receive it for them, notwithstanding her renunciation.

As will be seen, her renunciation ended her interest in the fund, but did not take away the interests of the children, or disqualify her from acting as guardian for her children. The prior estate of the children was not out of the way.

I think I have established the proposition, that where words, designating the end of a life as the termination of one estate and as the beginning of a next succeeding estate, such words are to be taken *prima facie* to mean the end of the life

estate, and not merely the end of the life of the anterior tenant.

Now suppose that this will, instead of adopting the machinery of one set of trustees, had adopted a plan to accomplish the same ends by the use of two sets of trustees, and that the body of this estate had been granted to these trustees, to hold in trust during the three lives (of the wife and the two daughters) expressly and only for the purpose of paying out during that period all of the net income of the estate from year to year, ($10,000 annually to the wife, and the residue of the income to his two daughters, or the survivors thereof, or to their children,) with all the directions contained in this will, as to not mortgaging certain parts, and as to improving certain parts, and as to the mode of investing funds constituting part of the estate; and that the remainder was, by the will, to vest in certain other trustees at the end of these three lives, for the sole purpose of distribution among the grandchildren, if any, and if none, then one-half for distribution among his nephews and nieces, and the other half for application for the purposes of a public library.

In such case, if the last set of trustees were now claiming the custody of the estate for distribution, could their claim be lawfully denied? The only purposes "fully set forth" in this will—as purposes of this trust—are, first, the distribution of the income as directed; and second, the distribution of the body of the estate when no further income is needed for distribution. Heretofore these trustees held for the purpose of providing for and applying net income; now they hold for the distribution of the body of the estate, and for *no other purpose.*

Now, what are the considerations, which, it is supposed, take this case out of the rule of construction which I have attempted to establish and illustrate? The grounds assumed in this regard do seem to me far from satisfactory, and, indeed, entirely untenable.

We are not at liberty to embark on a voyage of conjecture, outside the express words of the will, in search of intent, for we all approve the words of Williams, where he says the intention of the testator is always "to be sought in his words and a rigorous attention to them," and that otherwise the mind is apt to be led insensibly to speculate upon "what the testator may be supposed to have intended to do, instead of strictly attending to the true question, which is, what that which he has written means." And as already suggested, the words and phrases which he has written must have given to them that meaning which a long and unbroken line of decisions has established as their true meaning. I adopt as apt the words of my brother SHELDON where he says: "It is not the intention to be deduced from speculation upon what the testator may be supposed to have intended, but it is *the intention as spoken by the words* of the will." Let us bear this in mind while we examine the suggestions made against the application of the rule giving the true meaning of the words we have discussed.

It is conceded that the rules laid down by Jarman, and in the cases of *Jull* v. *Jacobs* and *Lainson* v. *Lainson*, are sound, and that " a gift to A for life and from and after the decease of A to B, C, D, or anybody else, means from and after the determination of the estate " of A ; " and whether the estate is determined by revocation or by death, or by the incapacity of the devisee to take, or by any other circumstance, the life estate being out of the way the remainder takes effect," and this because, under such circumstances, the courts universally hold, unless the contrary clearly appears, that the remainder has "only been postponed in order that the life estate be given to A."

But it is said "this doctrine of acceleration is not an arbitrary one." Certainly not; it is, as held by all courts, the result of the *true* meaning of such words,—the plain meaning of the words—and not, as suggested by counsel—the meaning "as words of art." By acceleration is not meant

acceleration to a time earlier than that indicated by the words of the will, but acceleration to a time earlier than that at which the prior estate would have ended, if not determined by a cause other than that named in the will. It it also said: "When it is the evident intention of the testator that the remainder should not take effect till the expiration of the life of the prior donee, the remainder will not be accelerated." Certainly not; but that evident intent must be *expressed* in the will, or necessarily implied from other words of the will. The words "after her decease," or like words, used as words of mere limitation of successive estates, do not indicate such intent, no matter how often they may be repeated; for they mean, in every form they take, the termination of the life estate.

Again, it is said "no artificial rule of construction can be allowed to prevail over the intention." I here protest against this rule of construction being characterised as artificial. It is not. It was adopted at a very early day in England, and has been universally followed in this country, because it is a rule of interpretation which leads to the true intention of the testator, and it is neither arbitrary nor artificial. It is just, wise and natural. I grant that it is not so inflexible that no express words or necessary implications can overcome this rule of interpretation of such words as "after the decease," when used as the limitation of a prior estate and as the beginning of a subsequent estate.

There are no words so cogent in our language that, when used in a will, their primary meaning can not be overcome by the use of other words in the same will, or by *necessary* implication from such other words. All I claim under this rule is, that the words "after the decease," when used in a will in reference to a life tenant as the time for the beginning of a subsequent estate, must be taken to *mean* after the end of the life estate in question, and are not to be taken to mean after the end of the actual life of such tenant, where the estate is ended by some other cause. And such meaning

is to prevail as giving the true intention of the testator, unless these words are shown to have a different meaning and to indicate a different intention by other words of the will or by necessary implication from such other words. I concede that this rule "is applied in promotion of the presumed intention of the testator,"—not merely an intention shown by other parts of the will, but an intention made manifest by these words themselves, in this their primary meaning in such cases. I concede, too, that "when it is the evident intention of the testator that these words should not have this meaning," or "that the remainder should not take effect till the end of the life of the prior donee," the rule does not apply. I concede "the rule would not apply if there was the expression of a contrary intent," and that "any expressed intention would be paramount to the rule."

It is said "no question is made as to this general rule." But what I find as an imperfection in the mode of reasoning against the conclusion of the circuit court is, that while the rule is avowedly conceded, it is first slurred as *artificial,* and its use as arbitrary, and then, in discussing the words of the will, the rule (so conceded) is entirely ignored and disregarded; and the words "after the decease," instead of being construed by the rule, are constantly treated as though they meant *prima facie* "after the end of the actual life," instead of "after the end of the life estate," which is their *prima facie* meaning under the rule, when introduced as mere words of boundary. Thus, it is said, the rule is relied upon "to *change* the *fixed time* of distribution in this case." Now this rule is not invoked to *change* the fixed time for distribution, but it is relied upon to show what time is in truth fixed for that purpose by the words of the will, when properly understood.

Thus, too, it is said "there is no hint of an intention" that the failure of the wife to take shall hasten or in anywise affect "the *expressed time* of the distribution." Now, by the rule conceded as above, the *expressed time* for distribution is

the end of the three estates for life carved out by the will.
Jarman says these words are to be *so read.* If so read they
furnish the expressed time, and there was no need of any
further hint on the subject. Again, although by the conceded
rule, in the absence of contrary overcoming words, the
appointed time for distribution in the contingencies which
have happened is at the termination of the three estates
named, "the death of the wife" is said to be the "appointed
time" for distribution. And it is said : "Had it been the
intention of the will that there should be distribution at the
end of the estates," a certain place in the will would be a fit
place "to have signified such intention, but there is no intima-
tion that way." Here again is a suggestion in utter dis-
regard of the rule. This suggestion is, that though by the
rule "after the decease" *prima facie* means "after the end of
the life estate," still the *want* of a *further* declaration, or
at least a further intimation to that effect, is a ground for
giving the words another meaning. In fact the whole argu-
ment (notwithstanding the admission that this rule of con-
struction can not be questioned) rests upon the implication
that the words "after the decease of my wife" must be taken
to refer to her actual death and not to the termination of the
testamentary estate offered to her. This, by implication, is
reversing the rule. And so (after expressing the opinion
that "the intention of the will is that the time of distribu-
tion should be the wife's death") it is added, "And this
intention is not deduced *solely* from the words used that the
distribution shall be "immediately after the decease of my
wife," but is manifested from other provisions of the will. It
would seem if, as is conceded, "no question is made as to this
general rule" that such intention ought not to be deduced *at
all* from the words used, "after the decease of my wife," for
by the rule, beyond debate, an intention the very reverse of
that indicated is to be deduced from the use of these words
*themselves.* The conclusion reached is thus confessedly
founded *in part* upon a disregard of the rule.

And again, it is said, "seeing he wills that distribution shall be made immediately after the decease of my wife," what reason is there for saying "that the rejection of the provisions of the will by the wife is the equivalent of the wife's decease, and that at the death of the last surviving daughter is the time for distribution?" If there be no question about the general rule, which is professedly conceded, the reason for so saying is the same as the reasons on which the rule is founded, and which are fully given in the authorities.

The rule is to prevail unless overcome by other words of the will. Let us now consider what other words of the will are supposed to repel the legal inference to be drawn from the words of the provision in question.

The considerations supposed to arise from *other words* of the will, tending to show an intention of the testator that this well known rule of construction shall not apply, are the following :

1. Such an intention is supposed to arise from the fact that he has not in any other words of the will said that the rule shall apply, and hence no such intention is to be deduced from these words. I have already shown that this mode of reasoning is inconsistent with the broad concession that no question can be made as to this being the general rule.

2. It is suggested that the words "after the decease of my wife" must have been used with reference to the end of her life, and not with reference to the end of her life estate, for the purpose of preventing a distribution of the estate to grandchildren while in their minority, and to prevent it from going into the hands of guardians instead of remaining in the hands of the trustees "of his own choice." If we are to speculate at all on this subject, to do so wisely we must try to place ourselves in the same circumstances which surrounded the testator when he used the words in question.

We must bear in mind that his trustees were at that time not young men—one about 47 and the other not less than 56— and by the tables the death of the last surviving trustee would probably occur within 28 years; that his wife was not less than 45 years of age, his eldest daughter not more than 22 and his youngest daughter not over 20 years of age ; and that by the tables the probable duration of the life of the survivor of the two daughters was about 47 years, and that the probable duration of the life of the survivor of the three (his wife and two daughters) was at that time not over 50 years.

If the widow should accept the estate offered her, the time (for distribution to grandchildren, if any,) probable to the mind of the testator was about 50 years.

If she should reject the estate and the distribution was to take place at the death of the last surviving daughter, the time for such distribution then probable to the mind of the testator would be about 47 years off, and the postponement, likely to arise from one construction, beyond the time probably indicated by the other construction, would not exceed three years, and would not probably occur until the end of 47 years, and at that time the last survivor of the trustees named would probably have been dead for about 19 years.

The will was published last in 1868. It was then probable that neither of the trustees named would be alive after 1896. It was not probable that both daughters would be dead before 1915. The youngest daughter, if about 20 in 1868, would be about 45 in 1893, and no grandchildren could reasonably be expected after that year. It follows that it was probable at the time of making the will that no final distribution could occur before 1915, and that at that time there could be no grandchildren born later than 1893, and hence none less than 21 years of age, and it was also probable that the trustees of his choice would at that time have both been in their graves for about 19 years. I can not believe that a *desire to keep* this estate out of the hands of guardians of

minor grandchildren, after the death of both of his daughters, could have had any influence with the testator in the selection of the words of this will in this regard.

The chance for one of these trustees, of the testator's "own choice," to supervise personally the estate of an infant grandchild of the testator, under the provisions of this will, after the death of both of these daughters, was so exceedingly slender that to me it seems a great stretch of fancy to suppose the testator had such contingency in mind when making this will. Had he designed to keep the body of his estate from the hands of guardians of minor grandchildren, it would have been an easy thing to have said so. It is suggested that otherwise he had shown less love for his daughters than for his unborn grandchildren—in this, that to the latter he gives, at the end of the three lives, the estate absolutely, while neither of his daughters could ever have anything beyond the net income from the estate. This I take it was meant as a kindness to the daughters, to protect the estate of each from waste by the possible improvidence of her husband.

It is not perceived that the clause directing immediate distribution to his grandchildren at the end of the three several estates for life (provided in this will for his wife and for his daughters), indicates any intent that acceleration shall not take place.

The law often casts large estates, by inheritance, upon children of tender years. And nothing in this will tends to show the testator designed to avoid such result. He has nowhere said that anything shall be withheld from his grandchildren, if any, until they reached a given age, or for accumulation. The whole estate was, under this will, liable to be cast upon a single infant grandchild, by the death of the wife of the testator and his two daughters, long before such grandchild should escape minority. But there was no probability of such result.

It is next suggested that the effect to follow renunciation by the wife, is specifically expressed to be the falling into the body of the estate of the testamentary gifts so rejected, and it is said no other effect is mentioned, and it is said no hint is given of an intention to hasten or affect the time of distribution ; and it is suggested that had such intention existed, here would have been a most fitting place in the will to have signified such intention. I do not think so. The matter of final distribution is not referred to at all in this part of the will. This proffered gift being thus made a part of the estate, it followed, without further words, that it became subject to the other provisions of the will, which do direct what shall be done with the body of the estate. The subject of the final distribution of the whole estate is not in any manner prescribed until much later in the will. Many contingencies are provided for after this clause, before the subject of final distribution is treated of. In fact, while this clause embraces no doubt the annuity to Mrs. Newberry, it is general, and covers many other gifts in the will, and it would have been a very bungling document had the draftsman stopped there and explained in detail what should be all the effects which would follow the falling in of each such gift. The words are, "I direct that in case of each and every bequest and of every instance in which I have directed my trustees to pay over money to any person or persons whomsoever, if the person or persons to whom or for whose benefit I have made such bequests or directions shall have deceased or from any cause be incapable of taking, then the amount so bequeathed or so directed to be paid over shall revert to and become a part of my estate, unless otherwise specifically directed." An examination of the whole will shows a very large number of bequests and of directions to pay over money. Had the draftsman of this will, after having prescribed this general rule, injected into this will, at this place, all the results in detail which in every contingency might be brought about thereby, it would have made the will very voluminous and could only have been accomplished by a man of great genius

and imagination. Such a will would have been an anomaly on earth. When it was declared that these failing gifts should not· be regarded as intestate property, but should revert and become a part of the body of his estate, it followed, without further words, that, as a part of the body of the estate, these defeated gifts should be dealt with as the other parts of the body of the estate, according to the provisions found elsewhere in the will.

It is also thought that the words "after the decease" of the wife must be construed to refer to the end of the life and not to the end of the life estate, because clauses referred to indicate an expectation that the estate would remain in the hands of trustees for a considerable length of time. No doubt the testator did have *that expectation.* I have shown that he had reason to expect that 47 years would pass away before the end of the life estate· of the last surviving daughter, and even if the wife did renounce, the estate would probably be in the hands of trustees for that length of time; and if the wife should not renounce, he had reason to expect that final distribution would not come under the will in less than about fifty years. But I think the directions as to the management of the estate are just as appropriate to a probable term of 47 years as they would be to a probable term of fifty years. I can not believe the chance of what might occur in that probable interval of three years—in the probable future fifty years ahead—had much influence in the choice of words in this will. I do not, therefore, see how the directions to his trustees that they should not mortgage or sell certain property while it remained in their custody, or the advice as to the application of rents to the improvement of certain property, or the direction as to the kind of securities in which moneys in their hands should be invested, tend to shed any light as to his intention on the subject—the time for final distribution. These directions are as appropriate in one case as in the other. Certain it is, they constitute no part of the *purposes* of the trust, which the testator says "are fully set forth" in the will.

They are merely directions and suggestions as to the best mode of accomplishing the purposes which are set forth.

It is suggested that we are to depart from the rule of construction in question, and say the actual death of the wife is meant, and not the end of her estate, because of a supposed intent on the part of the testator, that in case his wife should survive both of his daughters the estate should be held during that interval *for accumulation.*

I have shown how remote and unimportant was the chance of such a contingency, and have already alluded to the fact that holding for accumulation is nowhere mentioned as one of the purposes of the trust. That fact alone ought to dispose of this suggestion. But I have given that conjecture more careful consideration, and I find not only is no mention made of any such duty imposed upon these trustees, but the provisions of the will show, affirmatively, that *accumulation* was *not* one of the purposes of this trust. Let us again place ourselves, in imagination, in the same circumstances under which the testator made this will, and bear in mind that the probability, to his mind, was that the survivor of his two daughters would not die in less than forty-seven years, and then read this will, and we find that, by its provisions, *all* the net income was to be paid out during that *entire* period, and that accumulation during that entire period was expressly forbidden. · Whether his wife accepted or not there would be in all probability, in any event, only a period of about three years in which accumulation was possible under the will. Under these circumstances the conjecture that he had in view accumulation in the future, probably forty-seven years away, and for a period of but three years' probable duration, seems very far-fetched. The directions as to improvements of parts of the property seem, therefore, to have been made with a view of producing income to be spent from year to year, and not in anywise with a view to accumulation.

Much stress seems to be laid upon the thought that the testator had clearly in mind in making this will that the testa-

mentary gifts might be rejected. No doubt this is true, but it is equally plain he supposed she would accept these gifts, and to make this doubly sure he increased the annuity in 1868 from $8000 to $10,000. Counsel for the trustees say in their printed argument, "The provision was in fact *much more ample* and much more convenient for her than her one-third of the net product of the realty in which she had dower." They also say "this will was made and the testator died before the decision of this court was rendered in the case of *McMurphy* v. *Boyles*," 49 Ill. 110, and that "it was not then known that the widow was entitled absolutely to one-third of the personalty, and it was supposed that her statutory interest consisted of her dower and the share of the personalty called her *award*." This shows the reason for what was the expectation of the testator upon which the will was drawn. He undoubtedly *knew* she *might* reject the testamentary gifts offered, and demand her statutory allowance. But he expected and supposed she would accept his offer.

In view of these facts the language of the Vice-Chancellor in *Jull* v. *Jacobs* may well be applied to this will. We may well say: "It is perfectly clear that the direction that the distribution, after the death of the daughters, should be delayed until after the death of the wife, simply because she was to have the whole income as a security for the annuity, and was to have and enjoy her homestead. If she can not have this, why are the nephews and nieces and the founding of this library to be postponed? The reason for their postponement altogether ceases. They are not to have it until after her death, because the testator assumed that she would accept the testamentary gifts, and enjoy them during life. But he was ignorant of the law, which gave his widow one-third of all the personal property, and, hence, that the price he offered for her statutory rights was inadequate. He postponed his nephews and his nieces solely to support the provision offered to his wife, and if he had known that she

would not take the offered gifts, he would not have post-
poned his nephews and nieces.   He would not have left them
destitute in the meantime." These are the inferences drawn
by Lord ROMILLY from the use of the words, "after the
decease of my wife." In *Fox* v. *Rummery*, *Yeaton* v. *Roberts*,
*McNitt's Ex.* v. *McNitt et al.*, *Halliday* v. *Walker*, *Waddell*
v. *Terry*, and in the case of the *Estate of Matthew Delaney*,
the facts were the same in this regard.   The testator had in
each case vividly in mind that the widow might reject the
testamentary gifts offered, but that fact did not affect the
application of the rule of acceleration.

Under the head of other words which should be consid-
ered, (as it is suggested,) " as bearing upon the testator's inten-
tion," we are referred to the provision that all failing bequests
shall revert to and become part of the body of the estate ; and
to the provision which, at the end of the three lives, gives
the whole of the estate to his grandchildren, if any ; and to
the clause which directs that in the management of his estate
by his trustees, certain property in Chicago shall not be sold
or mortgaged during the lifetime of his wife and daughters, or
either of them, nor until it shall be necessary to divide for
final distribution ; and to provisions concerning the powers
and discretion given to the trustees concerning leases, sales,
and improvements in the erection of stores and other kinds
of buildings, as they may judge best; and to directions in
regard to investment of moneys, and the class of securities to
be sought.

These are all the provisions of the will which are supposed
to show any evident intent that the remainder should not be
accelerated.   No one of these provisions *expresses* any such
intent; nor does any one of them necessarily imply such
intent: no such intention is "spoken by the words of the
will."   And were we at liberty to enter the field of conjec-
ture, and " speculate upon what the testator may be supposed
to have intended to. do," I can not find in these clauses
ground even for speculation in favor of an evident intention

on the part of the testator that after the end of the three life estates, within the lifetime of his wife, the final distribution should be postponed until the physical death of his wife.

How do the words of the provision that, on the failure of every devise or bequest, the subject of the devise should revert to and become a part of the body of the estate, indicate such an intention? These words merely cut off the inheritance and exclude all inference of partial intestacy. According to the teaching in *Augustus* v. *Seabolt,* the indication is directly the other way. · There, it was held that the failure to cut off the inheritance *prevented* acceleration. It was there declared that had the inheritance been cut off the meaning of the will would have *demanded* acceleration : here, it seems to be supposed to have a contrary effect, and that case is referred to in support of the position that a provision *cutting off partial intestacy prevents* acceleration, and shows that the meaning of the will in such case does not demand it. This is not what the Court of Appeals of Kentucky said in that case. That court said exactly the contrary of the proposition for which that case is here cited. It seems to me this clause in this will is cogent in favor of the proposition that upon the renunciation of the widow in this case, the life estate offered her was then accelerated and went to the daughters for life, and left nothing in the way of final distribution except the estates for life of the daughters.

Now these are the *only parts of the* will relied on in this case "as bearing upon the testator's intentions," and of which it is said they contain "other words of the will which should be considered." It does seem to me that these provisions fall far short of showing clearly that "it is the evident intention of the testator that the remainder should not take effect till the expiration of the life of the prior donee." In fact such an inference from these provisions can not be other than mere speculation "upon what the testator may be supposed to have intended to do." Certain it is no such *expressed* intention is found in these clauses, by "a vigorous

attention" to their words; nor can such intention be found by "strictly attending to the true question, which is what that *which he has written* means." In fact there are no words in this will which, in any sense, tend to show that final distribution should await the actual death of the widow, except the phrase, "after the decease of my said wife and of both my said daughters," and the phrases "in case of the death of both my said daughters" without issue, then immediately "after the death of my wife, if she survive," but if not, then immediately "after the decease" of the last surviving daughter, my trustees shall divide my estate.

I have attempted to show that these words do not tend to show that final distribution should await the actual death of the widow, (but do show that it should await only the termination of the life estate,) and I do not understand it to be claimed, avowedly, that, *of themselves,* they do so show. But for that conclusion reliance is placed on the "other words" above noticed; and I think I have shown that these other words are wholly inadequate to bring about any such result.

The idea that the testator should, without any apparent purpose, place his estate in trust, to be held, not for the benefit of any *known* donee, but simply that it should lie *in idleness,* (except in its growth by possible accumulation,) until a future day, in the hands of trustees *answerable to no mortal* as to the manner of its management, to be kept in such a way as to be of no beneficial use to any person whatever, for an indefinite length of time, is so unnatural, so improbable, that no case has been found in which any such provisions have ever been made by any testator, so far as I have been able to discover. If appellees have as yet no interest in this estate, who can be found having such an interest in the estate as would enable him, should the trustees commit waste, to call to account these trustees before any court? We ought not, then, to assume lightly that the testator intended to accomplish a thing so unreasonable; surely not upon any mere speculation as to

such intent, or without clear evidence found in the words of the will itself.

It is a requirement of the law, that *all property* shall *at all times* be vested in somebody; for the law does not tolerate the idea of property without an owner.

It is the policy of the law that the right of present enjoyment of the use of all property shall at all times rest in somebody; for property is preserved and protected by law, for its use; and this policy is so decided, that unless the obstacles standing in the way are clear and unequivocal, the law does not tolerate the existence of such obstacles.

Cases are found wherein the testator has left property in the hands of trustees to be held until the ulterior donee should attain a given age, and should thus become supposably capable of preserving it. There are even cases where property is directed to be held until the birth of a child or children, expected or hoped for, and for whom it was intended, in such contingency, to provide. In such cases there is apparent on the face of the will the purpose itself, and the reason for the purpose is plain. No such purpose is found in this will, and no reason for any such purpose. To hold for mere accumulation is nowhere shown or set forth as one of the purposes of the will. Modes by which the estate may be preserved and rendered productive for the current and ultimate purposes of the will are set forth; but no design is shown anywhere to hold for mere accumulation.

But it is suggested, in support of the position of appellants, that the dower estate is still in existence. It is said, "there are no words of the will connecting the time for final distribution with the so-called testamentary estate of the wife any more than the statutory estate; nor in fact with either of them at all."

If the rules of construction laid down by the authorities, applicable to the phrases in this will having reference to the lifetime of the wife, and to the time of her death, (in connection with the termination of her testamentary estate, and in

connection with the beginning of ulterior estates, in the succession of estates mapped out by this will,) are adhered to and respected, it seems to me this last remark is hardly correct.

It is shown above that the words of the will do closely connect the time of final distribution with the testamentary estate of the wife, by first making her decease the boundary at which that estate is to cease, and then providing that the final distribution shall not be made, until that contingency occurs, which, as we have seen, means, until the termination of that testamentary estate.

These rules, as already shown, do connect the time for final distribution with the termination of all three of the estates for life, given or offered in the will, and final distribution is to follow close upon the end of the last of these three testamentary estates.

It is said " the widow has now a life estate in one-third of all the realty, showing there to be the same impediment of a life interest in the widow to final distribution now, that there would have been had she accepted the testamentary estate and annuity."

Is not this again a departure from the true question, which is, what do the words of the will mean ? We are not to "speculate as to what the testator may be supposed to have intended to do." By the words of the will properly construed the distribution was to await the end of the last of the three testamentary life estates. No words of the will say that it shall await the end of the dower estate. But, in answer to this, (which seems to me mere speculation,) it may be said that the dower interest vested by law in the wife is her own property, and was not the property of the testator. He, by his will, had no power or authority to dispose of that interest, and he has not attempted to do so. The will says nothing about it, save so far as an offer is made in the will for the purchase of it.

In itself the dower interest constitutes no more an impedi-
ment to immediate distribution than would the ownership by
a stranger of an undivided interest in the lands, the residue
of which constitute a part of the estate of the testator. The
reason of the testator for postponing final distribution until
the end of the testamentary estate, is plain from the words
of the will. The distribution was not postponed on account
of any dower interest, but for the sole purpose (clearly set
out in the will) of securing well to his wife the provisions
made for her in the will, and it can not be presumed that he
expected his wife would refuse to take what he provided for
her by will.

The testator intended that the annuity offered to his wife
should be secured beyond all question, and so secured that
his wife, seeing the absolute certainty of the security, might
the more certainly accept it. And to that end he made
the same a *first charge* upon the net income of the whole
body of the estate, and provided that final distribution
should await the determination of that—her life estate—
given in the will. He did not intend to nourish or sustain
the income of his wife from her dower interests at any given
standard whatever, and hence he did not charge any part of
his estate for that purpose. That is not one of the purposes
of the trust, for it is not "set forth" in the will. The main-
tenance of the dower estate is nowhere set forth in the will
as one of the purposes of this trust, and we must bear in
mind that we must look to the will for the purposes of this
trust, for these purposes are declared expressly to be "fully
set forth" therein, and no purpose, not therein fully set forth,
can properly be held one of these purposes.

Again, it is said the testamentary estate of the wife is but
an offer in lieu of the statutory estate of the widow.

This is, undoubtedly, true; and it is also true that the
testator knew it might not be accepted. This shows simply
that the testator, by his will, subjected the body of his estate
before final distribution to three principal purposes, if they

could be accomplished, and thus made the same each a charge upon the body of his estate in the hands of his trustees. The first purpose was to buy in the wife's statutory estate and thus increase the value of his own, and to that end he offered (*inter alia*) an annuity of $10,000 for life to his wife and to make the same a first charge upon the net income of his whole estate.

The other purposes were to furnish an annual income for life to each of his daughters of at least $2500, and to that end he appropriated the net income of the whole of his estate (subject to the charge of his wife's annuity) and he also subjected to this purpose so much of the principal of his estate as should be needed (if any) as would make each daughter's annual income in every year at least $2500.

These three purposes are "fully set forth" in the will, to be accomplished (if accepted) before final distribution, and when the income of. the estate should no longer be needed for either of these three cardinal purposes, he directed that final distribution should take place immediately to the grandchildren, if any, and if not, then in the manner sought in this suit. It is laid down in *Sears* v. *Hardy* (120 Mass. 529) the estate of mere trustees *must end* in *all cases* where the trusts upon which an estate is devised, *fail* or are accomplished. He nowhere intimates in his will that the dower estate is to be nourished from funds in the hands of his trustees, or that distribution should await the end of that estate. This idea that the outstanding dower of the widow is an impediment to present distribution finds no support in the authorities. No elementary writer has made such a suggestion, and the adjudged cases are against it. This suggestion is a credit to the originality of counsel, for the thought can be found in no law library, though hundreds of cases have occurred where the idea, if sound, would have been potent.

In the case of *Fox* v. *Rummery, supra,* the testator gave to his wife, "*in lieu of dower*," one-half of his remaining estate "for and during her natural life," granting her full power

to sell every part of the same and make reinvestments as she might deem expedient, "and after her decease, should my adopted son *survive her*, I give and bequeath all the *then* existing remainder of said half part to the trustees herein provided for the use of my adopted son."

The widow waived her rights under the will and took her statutory estate, dower, etc.

The heirs of the testator claimed that the use and income of that part of the property rejected by the widow, for the period from the renunciation until her death, was not disposed of by the will, and fell to them by inheritance. They insisted that by the terms of the will the adopted son was to take nothing of this part of the estate until "after her decease."

But the court held there was no intestacy, and speaking of the renunciation said, "that the effect thereby produced is that the wife take her dower in realty," etc., "leaving the remainder of that moiety *to pass* under the will to the trustees for the adopted son."

The court said, "All the wife's interest in it is at an end as much as if she were dead. The rule is that the extinction of the first interest carved out of the estate only accelerates the right of the second taker. This is the only disposition of this surplus of the wife's moiety which is consistent with the testator's declared will." Here, the dower estate was held no impediment to the next taker.

So in *Yeaton* v. *Roberts, supra*, the testator gave to his wife the residue of his estate "for and during her natural life," and *then* to go in fee to the children of Oliver Yeaton and Leavit Yeaton.

The widow renounced the benefits of the will, and took her statutory estate.

It was held that the children of Oliver Yeaton and Leavit Yeaton took under the will at once, and that upon the refusal of the widow to take the life estate provided for her in the

will, the ulterior limitations took effect, notwithstanding the widow still lived.

In that case, the testator (with full knowledge that his widow might reject the life estate offered by the will and take her dower) provided that at the end of her natural life this property should go to a class—the children of Oliver Yeaton and the children of Leavit Yeaton—and yet the court did not construe this language to indicate an intention on the part of the testator that the distribution to the class named should await the falling in of the dower life estate; but did understand it to show that such distribution should await the end of the life estate offered to the widow in lieu of her dower, and should be delayed no longer.

So in the case of *McNitt's Executors* v. *McNitt et al.* *supra,* the gift under the will as part provision made to the wife of the testator *in lieu of dower,* was to trustees to pay the income from certain lands and from certain stocks and bonds " during the term of her natural life, or so long as she shall remain my widow," and " after her decease or marriage" to permit an infant daughter to enjoy the same, etc.

The widow renounced, and the rights of this infant daughter were held to take effect at once, and no mention is made of the idea that the dower estate was in the way of this acceleration.

So in the case of *Holliday* v. *Walker, supra,* where the gift was to the wife of the testator during her natural life, and at the death of his wife this gift was to go one-half to Wm. R. Walker, and the other half to Elizabeth Evington if she lived to be married, and between the death of the wife and the marriage of Elizabeth, her share was to go to trustees for her support and maintenance.

Walker died before the testator. The widow renounced and took her dower. It was held that acceleration took place at once, although the dower estate was still *in esse,* the court saying, " the same result which would have been arrived at by the death of the widow must, in our opinion, be

brought about by her dissent." Again, in *Waddell* v. *Terry, supra,* the testator, by his will, said, "I give all my real and personal property to my wife, Mary E. Manley, and my son, Thomas J. Manley, to be equally divided between them, as hereafter specified, to-wit: I give to my wife a life estate in one-half of all my property, and if she dies before my son, the half given to her to revert to my son, if he dies before my wife the half given to him shall revert. to her during life, and if my son die without issue before he is twenty-one years old, the net proceeds of my crops shall be paid into the hands of my two brothers, John and James, and of my two sisters, Frances and Mary; but if my wife should be living at the death of my son, my property shall belong to her for life, and then the proceeds paid over to my brothers and sisters, or other heirs, as I above directed. I direct that all my property shall be kept together for the benefit of my wife and son during their lives, or the life of the survivor of them, and at their death to be kept together for the benefit of my brothers and sisters, or other heirs, and the net proceeds paid them or their representatives. If my son shall arrive at twenty-one years of age and shall survive my wife, then I give all my estate to him and his lawful issue living at the time." The widow renounced her rights under the will and took her dower and share of the estate under the law. The son afterwards, during his minority, died without issue. The brothers and sisters claimed that their interest vested at the death of the son, and that they were entitled to the beneficial interest in the estate from and after his death.

On the other hand, it was contended by the defendants, the heirs, that the remainder was contingent until the death of the son, and though it then vested in the brothers and sisters, it did not then take effect in possession and would not take effect in possession until the actual death of the widow, and claimed that the beneficial interests for and during the

interval between the death of the son and the death of the widow, by operation of law should go to the heirs.

The court here decided that there was no partial intestacy, and held, "upon principle as well as authority," that the use and enjoyment of the interest in remainder took effect immediately on the determination of the prior estate, and gave the immediate beneficial interest to the brothers and sisters, under the will, although the widow was still alive and enjoyed her dower estate.

I might accumulate cases of this kind without limit, but it is sufficient to say, that after a careful research and an examination of the long list of authorities collected and presented by counsel for appellants, I have found no case of a life estate given to a widow, with a remainder over to others, and in which the widow renounced her rights under the will and took her dower and allowance under the law, where it was held by the court that the existence of the dower estate prevented the next taker from taking immediately, the testamentary life estate which was rejected by the widow being out of the way.

Again, it is suggested that the will plainly contemplates that the final distribution should be integral and complete, whether to grandchildren or between descendants of his brothers and sister and the public library. In this view I concur. But it is said, "the reversion expectant in the dower lands *can not be distributed* until the death of the doweress." This seems to me a mistake. Such reversion expectant had a present money value, and can be sold or set off in distribution at once, without any legal obstacle whatever.

Lastly, it is said the estate of the trustees under the will is in the way of present distribution. If that be so it will always be in the way. I think it is not in the way, but is an essential factor in the accomplishment of the thing sought. There could be no final distribution under the will unless the trustees held title to the property. As well might an administrator, after payment of all debts, refuse to distribute

the remaining personalty among the heirs upon the ground that his legal title to the personalty was in the way—alleging that his intermediate estate was still in the way.

It is suggested that it could not be "thought necessary that the whole of this large estate should be kept together to support a trust to pay an annuity of $10,000 to the wife." It is said, "but a small portion of the estate would be needed to produce that annuity, and that this annuity is not made an *express* charge upon the estate."

It does not seem, now that this estate has turned out so productive, in point of fact, that it *was* necessary to keep this large estate together for the mere purpose of maintaining an annuity of $10,000. But in construing the will we must look at the views which, from the words of the will, the testator seems to have entertained in relation to the estate at the time when he made his will. When the will was first drawn he provided an annuity of only $8000 for his wife, and $2500 for each of the daughters, making in all only $13,000 a year. It may well be supposed, for aught that appears in this record that, at the time the will was made, a large portion of this property was unproductive real estate, subject to heavy taxation, and liable to heavy burdens in the shape of special assessments for local improvements, and the testator evidently was desirous that there should be no failure to produce these annuities, and appears, from the words of the will, to have apprehended that the estate might not produce at all times the necessary amount, to produce even the amount of $13,000 a year net. This is evident from the provision found in the will, that if the income should not be sufficient to pay these annuities to his wife and his daughters, his trustees were to take enough from the principal of the estate to pay the annuities. Although, in point of form, these annuities are not declared *expressly* to be a charge upon the estate, and although they are not made a charge, in the sense of being liens upon any particular property of the estate, still the intention of the testator to subject the entire estate, in the

hands of his trustees, to the support of those three life estates, is plain and palpable and is clearly expressed by the words of the will, and they are the three leading purposes of the will, and the only important purposes that are set forth in the will, to be accomplished prior to the final distribution of the estate. Hence the annuities are, in substance and legal effect, made each a *charge* upon the estate.

It is suggested that the annuities for the wife "might have been provided for as was done by the court in *Sears* v. *Hardy*," *supra*, "by setting aside a part, say $200,000, invested in such securities as are directed by the will," and "then the rest of the estate would be *disengaged*." The suggestion here made of a mode by which "the estate would be disengaged," by providing for the annuity in another way, by necessary implication, concedes that the annuity is made a charge upon the estate by the will. If this be so, it is not perceived that it is a matter of any significance whether such charge be fastened upon the estate *expressly*, or merely by necessary implication. It is enough that the wife's annuity was, by the legal effect of the words of the will, made a charge upon the estate,—and a first charge to take precedence of all other things. The annuity to his daughters was made secondary thereto.

It is, no doubt, true the testator might have provided for this annuity expressly, in the mode suggested; but it is also true that he did not do so, and we have no warrant for speculation as to the motives of the testator not expressed in the will, or for speculation as to the sufficiency of the reasons governing the testator. With money now at three per cent, (in United States bonds as advised by this will) $200,000 would produce but $6000 a year for the widow, instead of $10,000,—so the wisdom of the testator in not adopting the course suggested, is vindicated.

It is enough for us that the testator chose to support each and every one of the annuities, for his wife and daughters for life, with the income from the whole of his estate, and to

postpone its division until all of that service had been per-
formed by the estate ; and surely, if he postponed division
longer than necessary, that is no reason why this court should
postpone it still longer.

As to this case of *Sears* v. *Hardy,* its philosophy is against,
rather than for, appellants in this case.

The testator in that case gave the residue of his estate to
trustees, in trust, to hold, invest, manage and take care of,
and expressed a wish that they invest one-half thereof in
productive real estate, stores to be preferred, and one-half in
bottom mortgages.

He gave to his son $30,000, to be paid to him when he
attained 21 years of age, and ordered so much of the income
of the body of the estate as might be needed for that pur-
pose, to be used for his support and education, and directed
$4000 *annually* to be paid to him when 21 years old, and
$6000 a year when 25, and $10,000 a year when 30 years
old.

The son having attained 21 years, and received his legacy
of $30,000, there was left in the hands of the trustees a large
surplus not needed to support the annuities for the son.    The
will did not give to the trustees any direction as to the dispo-
sition of this surplus.

The son was the only heir, and by him it was insisted that
this surplus was not disposed of by the will, and therefore fell
to him by inheritance.    The trustees claimed that the gift to
*them* as trustees, "in trust," to "*hold,*" etc., gave the surplus
of the estate to them, and, not having any direction as to its
use, they should hold the same to their own use.

The court held that the trustees could only hold for the
purposes of their trust, and that there arose a resulting trust
in favor of the heir, as to this surplus, and directed that the
trustees retain in their hands enough of the estate to produce
a net annual income of $10,000, as a provision for the son's
annuities, and that the balance of the property be transferred
to the heir.

This case is quoted by appellants and mentioned with approbation by the court in the case at bar. If it has any application to the case at bar, its teaching is against the appellants. It would seem to teach that if Mrs. Newberry had not renounced and the trustees were now paying her the annuity of $10,000, and the ultimate takers had applied to the court for that purpose, it would have been proper for the court in this case to have set aside enough to support that annuity, and to have ordered at once a transfer of the surplus to the ultimate donees under this will. If this be so, there now being no annuity to support, the position that they should *now* transfer and divide seems to follow necessarily.

In view of the considerations and authorities herein presented and discussed, I am forced to the conclusion that, as this will provides for a regular succession of consecutive estates,—(the termination of each of the *intermediate* estates being marked by words indicating the decease of the holder as its end, and as the beginning of the next succeeding estate),— these words are used as mere words of *limitation,* and not as words of *qualification,* as to the ultimate takers.

And I can not see that this conclusion is forbidden by the other words of the will referred to, providing that the funds of all failing bequests shall thereby become part of the body of the estate, or by those words providing that the grandchildren, if any, shall take the estate at the end of the last of the three lives named ; or, by those which direct that certain property shall not be mortgaged by the trustees, nor sold until necessary for final distribution ; or by those words giving advice and direction as to sales and leases of other property, and as to the improvement of certain parts of the property, or directions as to the mode of investing surplus moneys. Nor can I perceive that these words are at all inconsistent with this construction (or that any one of these clauses, or all of them, tend in the slightest degree to repel this construction) of the governing words in question. Nor can I perceive that the existence of the dower estate militates

against this conclusion, or stands at all in the way of executing the plain meaning of the governing words of the will, in their true and legal meaning according to the canons of construction recognized by every court in England and America.

If this be so, the legal effect of the facts has been and is, that on the renunciation by Mrs. Newberry the daughters took by acceleration that which would have been their's had she died, that is, the whole income so long as they both lived; and at the death of Mary the whole of the income was cast upon Julia; and at her death it was cast upon the appellees and the public; and *then* it became the duty of the trustees to make division and final distribution.

MULKEY, J.: I concur in the foregoing dissenting opinion.

Mr. JUSTICE WALKER, dissenting:

I am unable to concur in the conclusion reached in this case by a majority of my brethren. The case is, perhaps, not entirely free from difficulty, as a state of things has occurred which was neither foreseen nor provided for by the testator. He evidently supposed, when making his will, that his wife would accept the provisions he made for her, and that his two daughters would survive her. Had he supposed his wife would renounce the provisions of the will, and survive his daughters, dying without issue, he no doubt would have provided for distribution on the death of the latter surviving daughter. This may be inferred from the fact that he has not indicated the slightest intention that the trustees shall, in any event, hold the trust property for mere accumulation until it should increase to a specified sum, or until a particular period.

The great and controling object he had in executing the will was to place all of his property in the hands and under the control of trustees during the lives of his wife and daughters, that from the income and profits of his entire estate money might be produced with which to pay to each

specified annuities during their several lives, and at the death of the longest liver a final distribution should be made, as therein directed. But it must be borne in mind that a part of this scheme was to provide an annuity for his wife during her life. When that part of the plan became impossible of execution, by the renunciation, the general purpose of the will was, to that extent, frustrated, and by the death of the two daughters, without issue, the balance of the purposes of raising the trust were defeated and came to an end, and were wholly incapable of being further executed.

After the renunciation of the widow and the death of the daughters, the purposes for which the trust was created were as fully completed as if the widow had first died and the daughters afterwards. When the widow renounced the annuity in her favor, it ceased as effectually as had she then died. After that, under the law, the trustees were as incapable of paying it to her as if she had been deceased. Their and her position to the trust fund were precisely the same as had she been deceased. It had, in law, become impossible to execute the trust in her favor, as her renunciation prevented the payment of her annuity. The death of the daughters without issue rendered the further execution of the trust in their favor impossible. As to them it had answered fully the purposes of its creation, and was fully executed. Then, being fully executed as to the daughters, and rendered impossible of execution in favor of the widow, is not the purpose for which the trust was raised fully terminated ? It seems to me that all must concede that it is. There is no reason appearing in the will for its further continuance.

It is a familiar rule that when all things required, or duties imposed, by a trust have been fully performed, and nothing further remains to be done under the trust, a final distribution of the fund must be had. And it must be true that when, from any cause, it becomes absolutely impossible to perform the trust, or any portion of it, then a

final distribution must take place. If any of the beneficiaries are living and entitled to the benefits of the trust fund, or any of the purposes of the trust are unaccomplished, but are capable of being executed, the trust will be kept alive for the purpose. But when all the beneficiaries are dead, or incapable of receiving the benefits of the trust, it is entirely useless to keep the trust on foot, and the law never requires the performance of an useless act. It has become, under the law, absolutely impossible to execute this trust, and according to every principle governing trusts and trustees, it should terminate and cease.

Testator raised no trust of any kind for any object, or any purpose, but for his widow and daughters. There can be no pretense that there was created any kind of a trust for the benefit of the distributees. The devises and bequests were to them as contingent remainders. They do not take as *cestuis que trust,* but as distributees in remainder. The trustees, in terms, are not required by the will to hold the property for the distributees, either for accumulation or to pay them the profits arising from the fund. The trust has ceased, and the trustees hold the property simply for distribution. No possible necessity is perceived for keeping the trust on foot for any purpose, nor do I see that any rule of law, or principle of justice, can be infringed by an immediate distribution of the estate. There is no person that can be injured in the slightest manner by it. Nor is it possible to see any benefit that can result by delaying the period of distribution until Mrs. Newberry's death.

According to the purpose and plan of the will, I am unable to see the slightest reason in law or justice for awaiting that event. No purpose of the will, whether expressed or implied, further than that event is simply named as the period, appears. All of the purposes of the trust have been defeated because impossible of execution, and immediate distribution should, in my judgment, be had.

Counsel on each side have displayed a wonderful amount of industry, research and skill in collecting and presenting the abstruse, technical and artificial rules governing contingent remainders and executory devises. They have shown great skill in taking nice distinctions and limitations of these intricate rules, but without here going into their discussion, I content myself by giving in brief the reasons which I, since the first argument of the case, think should govern its decision. I am of opinion that the circuit court decided correctly, and that its decree should be affirmed.